CONSOLIDATED–HAMMER DRY PLATE & FILM COMPANY, Transferee, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 14019.

United States Court of Appeals Seventh Circuit.

May 21, 1963.

Maurice P. Raizes, Chicago, Ill., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Stephen Wolfberg, Attorney, Tax Division, U. S. Dept. of Justice, Washington, D. C., Lee A. Jackson, Melva M. Graney, Michael I. Smith, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Consolidated-Hammer Dry Plate & Film Company, Transferee, a Delaware corporation (hereinafter referred to as the taxpayer), has by its petition in this court sought a review of the decision of the Tax Court of the United States in a case involving alleged deficiency in the payment of federal income taxes by Consolidated Photo Engravers and Lithographers Equipment Company, an Illinois corporation (herein referred to as Photo Engravers), for the taxable periods ending November 30, 1950 and August 31, 1951, which were assumed by taxpayer through a merger on the latter date.

In November, 1949, Photo Engravers entered into a contract with the United States Air Force for the construction of a large vertical test camera at a contract price of $39,300.

Photo Engravers also entered into two other contracts with the Air Force in May 1950 and April 1951, as well as a contract with the Corps of Engineers, United States Army, in February 1951, all for construction of various equipment.

All of the contracts entered into by Photo Engravers with the armed services contained, *inter alia,* the following general provisions:

"2. Changes

"The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery * * *.

\* \* \* \* \* \*

"7. Payments

"The Contractor shall be paid, upon the submission of properly certified invoices or vouchers, the prices stipulated herein for supplies delivered and accepted or services rendered and accepted, less deductions, if any, as herein provided. Unless otherwise specified, payment will be made on partial deliveries accepted by the Government when the amount due on such deliveries so warrants; or, when requested by the Contractor, payment for accepted partial deliveries shall be made whenever such payment would equal or exceed either $1,000.00 or 50% of the total amount of this contract.

\* \* \* \* \* \*

"Partial Payments—Partial payments, which are hereby defined as payments prior to acceptance on work in progress for the Government under this contract, may be made upon the following terms and conditions.

"(a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: Provided, that such partial payments shall not exceed 75% of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence

submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: Provided further, that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments, if any, made under this contract, exceed 80% of the total contract price of supplies still to be delivered.

"(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: Provided, that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract.

"(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained."

Pursuant to the partial payment provisions of these contracts, Photo Engravers submitted invoices and received amounts thereon.

Respondent, the Commissioner of Internal Revenue (hereinafter referred to as Commissioner), has determined that all of the partial payments constituted income *upon receipt* thereof, and the Tax Court in effect so held. On the other hand, taxpayer contends that it was proper to report the partial payments as income *only when delivery and acceptance of the products were made*.

Thus in conformity with that position, taxpayer reported, as a part of its income in 1951, when delivery of the items was made, partial payments received in 1950 on the November 1949 contract.

1. Photo Engravers was an accrual basis taxpayer. The clause in the contract providing for partial payments reads that the Contracting Officer *may* authorize such payments. When made, such payments were subject to certain requirements for completing the sale, such as drop tests and environmental tests, which rendered every such contract subject to changes and revisions as recommended by the government.[1]

The amounts of partial payments are rigidly limited by the terms of the contracts as above set forth. In addition the government when it makes any partial payment under such a contract continues to hold and indeed to take title to, not only the work produced as covered by the invoices upon which the partial payment is based, but to parts, materials, work in process and tools thereafter acquired or produced. This provision of course applies not only to the goods covered by the invoices and the partial payment, but also to future acquired goods and property.[2] This provision for the granting of title to the government for

---

1. The contracts incorporated various detailed provisions including the following:

"5. Inspection

"(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event *prior to final acceptance.*" (Italics supplied.)

2. The partial payments clause provides that its provisions "shall not relieve the Contractor from risk of loss or destruction of or damage to property to which title vests in the Government under the provisions hereof."

materials, work in process and tools, not being limited to those then in possession of the contractor, but being specifically extended to such as may be produced or acquired in the future, is characteristic of the security frequently taken by a creditor, who makes advancements. It is suggestive of the incidents of a program of financial assistance to small business concerns, such as is provided by the Small Business Administration under 15 U.S.C.A. § 631 et seq., and other federal legislation. The similarity is accentuated by a reference to 10 U.S.C.A. § 2307, which, in referring to procurement from small concerns by the various agencies of the government, explicitly authorizes the head of any agency to make advance or partial payments upon security "in the form of a lien * * * on the property contracted for, on the balance in an account in which such payments are deposited, and on such of the property acquired for performance of the contract as the parties may agree." See also 41 U.S.C.A. § 255.

█ While taxpayer makes no contention that these acts are expressly applicable to the transactions involved in the case at bar, we believe that the same congressional purpose of assisting concerns dealing with the procurement officers of the defense department is present here. The language of the contract before us to the effect that the title to goods, not in existence at the time a partial payment is made, passes to the government upon acquisition of property subsequently to the date of the partial payment, supports the taxpayer's contention that this partial payment plan has the attributes of a financing arrangement. It is apparent that the parties to the contract realized that Photo Engravers would require partial payments to help finance the numerous expenditures to be involved in the performance of the contract. The partial payments were payments "prior to acceptance" of the finished product. They were attributes of a financing arrangement in the nature of a loan and the proceeds of a loan do not constitute taxable income.

█ It is our conclusion that the partial payments were reportable as accrued income for income tax purposes only when delivery and acceptance of the products were made.

The Tax Court evidently failed to agree with this view. The Commissioner contends that, "once its invoices were approved", taxpayer "had an unrestricted right to receive the amounts in fact received under a claim of right during the taxable periods in question and, therefore, under well-settled principles, the partial payments were income to Photo Engravers at that time." However, there is no evidence [3] that any inspection or tentative approval was given for any of the items shown on the invoices for partial payments, nor that the sum of partial payments was matched with progress being made under the contract. To the contrary, the evidence showed that *after* the partial payments were received, the invoices were found to be erroneous. The contract fixed the time for inspection and test by the government "in any event" as "prior to final acceptance", *post* 4, rather than by any reference to the time of partial payments.

When the product was finished and accepted, the day of reckoning had arrived. Until then the right of the taxpayer to retain any partial payments on account was conditional or tentative.

The Commissioner also argues that "the fact that such [partial] payments may thereafter have to be returned is immaterial." He relies on Healy v. Commissioner, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007; North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; and Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746; as well as our holding in Phillips v. Commissioner, 7 Cir., 238 F.2d 473. The vitality of the claim of right doctrine seems inscrutable in view of American Automo-

---

3. With the exception of an initial delay occasioned by the reaching of an agreement between the parties on a *prototype* printer.

bile Association v. United States, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109.[4]

All of these cases involved income under *service* contracts or the payment of *net profits* earned from a property during a receivership. In the case before us we are confronted with income from *sales of property*. While observance of this distinction is not controlling in our thinking, it has substantial recognition, as stated in Mertens' Law of Federal Taxation, Vol. 2, p. 359:

"§ 12.118. When Income from Sales of Property Is to Be Reported. Contracts for the sale of property differ so widely, according to the nature of the property which is the subject of sale and the varying complexities surrounding the passing of title and the terms of payment, that it is necessary to use with caution each decision in which the year for reporting the income is determined. The basic question is always to determine *when a sale is made*. * * *"

In this court the Commissioner remains silent as to United States v. Harmon, 10 Cir., 205 F.2d 919 (1953), upon which taxpayer relies. In that case Harmon, an accrual basis taxpayer, on November 12, 1943, executed a certificate of completion of his work on three governmental projects, but the execution of certificates of completion by various governmental employees successively was not completed until January 4, 1944. In December, 1943, Harmon honored a change order approved by the government authorizing increased wages, and on January 11, 1944 Harmon sent claims for reimbursement for these amounts, the payment of such claims to the subcontractor being authorized in February 1944. These claims were paid by the government in February 1944. Final audits were made and the amount due Harmon was determined. As a result of the audit, overcharges on use of equipment and other items were disallowed and deducted from Harmon's retained fixed fee. On May 16, 1944 the remaining balance of the fixed fee was paid. The question in the case was whether this income should have been returned in Harmon's 1943 return or whether it was properly returned by him in his 1944 return. At 921, the court said:

" * * * At the end of 1943, Harmon's interest in the retained portion of the fixed fee was subject to proper set-offs and deductions, if any, which might be revealed by the final audits. A number of things remained to be done upon which the determination of that amount depended. The audits had not been completed. The outstanding claims had not been paid. Harmon's right to be credited with all these claims had not been finally determined. These matters were not determined until in 1944 and until that was done Harmon's interest in the amount of the fixed fee remaining in the Government's hands was not established with finality and certainty. * * * An unconditional liability on the part of the Government to pay Harmon a fixed and definite sum did not arise in 1943. As pointed out, it could not arise until all audits had been completed and an adjustment with respect to claims had been made and this did not occur until 1944 and as a result no income tax liability arose with respect to the amount in question until in 1944."

The Tax Court has followed Harmon in Marquardt Corporation, 39 T.C. No. 42, 1, 14.

2. Taxpayer raises the question of whether an addition of $4,676.93 to a reserve for bad debts by Photo Engravers for the year ending November 30, 1950, was, as the Tax Court held, unreasonable and hence not deductible. It further contends that the Commissioner's action in disallowing the deduction was arbi-

---

4. Some of the legal periodicals have raised the question of whether the holding in this case has been an abandonment of the doctrine of the "Claim of Right".

47 American Bar Association Journal, 1218, 1219; 47 Cornell Law Quarterly, 475, 478; 61 Michigan Law Review, 148, 162.

834

trary. The Commissioner states that what is a reasonable addition is a question of fact.

 Taxpayer seeks to justify this addition by pointing to the fact that *in 1953* it wrote off bad debts to the extent that the bad debt reserve was depleted. Where such an addition has been challenged by the Commissioner as being unreasonable the taxpayer has the heavy burden of sustaining the deductibility thereof. American State Bank of United States, 7 Cir., 279 F.2d 585, 590. The anticipated losses to which the addition to the reserve is to apply must be judged by the contemporaneous conditions. There is no showing in the case at bar that losses were probable if viewed at the time the addition was made and computed. This is bolstered by the fact that Photo Engravers experienced no bad debts during the period December 1, 1946 to November 30, 1950, even though it had a reserve for bad debts in the amount of $3,017.37 during that period.

We find no error by the Tax Court in its ruling on the addition to the reserve for bad debts.

3. Although Photo Engravers' income tax return for the period ending August 31, 1951 was due to be filed on or before November 15, 1951, an extension was granted to January 15, 1952. Without a further extension having been granted, said return was not filed until February 25, 1952. Because of said dereliction the Commissioner assessed an addition to the tax, which was sustained by the Tax Court.

In this court taxpayer contends that the evidence shows that it is a small corporation, whose president had the responsibility of numerous duties, and that taxpayer itself was in the midst of much turmoil. The president testified that he thought a further extension had been obtained.

Taxpayer's counsel urges that there is a question of doubt as to whether taxpayer's default was the result of the failure to exercise ordinary business care and prudence, and therefore

a well-known principle of law applies: "All questions in doubt must be resolved in favor of those from whom the penalty is sought". He cites Hatfried, Inc., v. Commissioner, 3 Cir., 162 F.2d 628 (1947). We find in these facts no excuse for failure to file within the extended time. In Hatfried no return was filed, because of advice from the taxpayer's accountant after full disclosure of the facts. In the case at bar the omission was intentional and taxpayer made no further effort to secure another extension of time for filing its return. The Tax Court did not err in this respect.

In accordance with the views herein expressed, the decision of the Tax Court is reversed in part and affirmed in part, subject to recomputation by the Tax Court of said addition to tax, imposed under § 291 of the Internal Revenue Code of 1939.

Decision affirmed in part and reversed in part.