BIRD MANAGEMENT, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

A. U. BIRD TRUST, TRANSFEREE, SIDNEY M. BIRD, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2714–65, 2715–65. Filed July 21, 1967.

*Robert J. Richards, Jr.,* for the petitioners.
*Rufus E. Stetson, Jr.,* for the respondent.

588

**OPINION**

Raum, *Judge:* 1. *Nonrecognition of Loss Under Section 337.*— Petitioner claims that it has overpaid its income tax for the taxable year 1961 because it took no deduction for a $248,201.23 loss sustained in that year on the bulk sale of its assets to the Maritime Corp. Its contention in this respect represents a complete reversal of the position taken in its income tax returns where it stated that the transaction was governed by section 337 of the 1954 Code, which provides for

nonrecognition of gain or loss on the sale of assets in connection with a plan of complete liquidation.[1] Just why petitioner undertook to bring itself within the provisions of section 337 is not clear. However, it now seeks to extricate itself from the unhappy consequences of that course of action. And it now argues that section 337 is inapplicable because it did not distribute all of its assets within 12 months of the adoption of its plan of complete liquidation, as required by section 337(a)(2). That contention rests upon the circumstance that tax refund checks of $25 from the State of Maryland and $21,594.96 from the U.S. Treasury were issued to it and received by its sole stockholder more than 12 months after it resolved to liquidate. There is no dispute that, apart from possible future tax refunds, petitioner had in fact distributed all of its assets within the 12-month period. We hold that it has failed to prove that it had not distributed the rights to all future or contingent claims (including its right to the tax refunds) to its sole stockholder within the 12-month period, and that petitioner has therefore failed to establish the inapplicability of section 337; accordingly, no gain or loss can be recognized on the sale of its assets to Maritime.

That petitioner intended to comply with the provisions of section 337 during the period June 26, 1961, to June 26, 1962, is clear beyond doubt. Its board of directors on June 26, 1961, adopted a plan of complete liquidation, leaving to the discretion of petitioner's principal officers the manner and time in which petitioner's assets should be liquidated and the proceeds distributed to its sole stockholder, but providing that the liquidation and distribution be completed "in any event within twelve months of the date hereof." Petitioner scrupulously complied with the requirements of the regulations, sec. 1.337-6, by attaching to its returns for the taxable year 1961 and the taxable period ended June 15, 1962, statements setting forth the information required by that regulation.[2] The statement in the 1961 return declared

---

[1] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporate adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

[2] Sec. 1.337-6 Information to be filed.

(a) *Cases to which section 337(a) applies.* In cases to which section 337(a) applies, there must be attached to the return of the liquidating corporation the following information:

(1) A copy of the minutes of the stockholders' meeting at which the plan of liquidation was formally adopted, including a copy of the plan of liquidation.

(2) A statement of the assets sold after the adoption of the plan of liquidation, including the dates of such sales. If section 337(c)(2)(B), relating to limited nonrecognition of gain on sales by subsidiaries, is applicable, this statement must include a computation of the total gain and of the gain not recognized under section 337.

(3) Information as to the date of the final liquidating distribution.

(4) A statement of the assets, if any, retained to pay liabilities and the nature of the liabilities.

that the "Distributions in liquidation totaled $2,039,907.61 to December 31, 1961. Liquidation will be complete before June 26, 1961 [3] (sic)." And the statement in the return for the period ended June 15, 1962, after reciting the distributions to December 31, 1961, declared that "Distribution of all remaining assets was completed on June 15, 1962 ($285,169.74)." Those statements, and the returns to which they were attached, indicate that petitioner ceased its business activities and did in fact completely liquidate and distribute all of its assets by June 15, 1962, within 12 months after adopting a plan of complete liquidation.

Petitioner, then, made a calculated and deliberate attempt to comply with the requirements of section 337. It had the benefit of experienced professional assistance, and we cannot say on this record that it failed to achieve its announced objective. The subsequently received tax refunds are the only assets claimed not to have been distributed during the 12-month period. But there is no evidence whatever before us to establish that the rights to any unmatured or other claims not then known to petitioner had not been transferred to its sole stockholder along with the balance sheet assets. The burden is upon petitioner and there has been complete failure of proof in this connection.

The record is utterly devoid of evidence as to the manner in which petitioner made its liquidating distributions. Were they made pursuant to documents transferring rights in respect of petitioner's assets? If so, were the assets identified separately, and was there any catchall clause referring to all other assets of every kind? Or was there any other language susceptible of being interpreted as dealing with contingent, future, unmatured, or unknown claims? [4] We do not know the answers to these and other pertinent questions that suggest themselves to us in considering this matter.

In these circumstances we are unable to conclude that the rights to future tax refunds were not transferred to petitioner's sole stockholder in the course of carrying out petitioner's attempt to liquidate completely within the statutory 12-month period. And if such rights had in fact been transferred, so that as between petitioner and its sole stockholder, the latter became entitled to the refund checks when they

---

[3] The year 1961 was set down obviously in error in place of 1962.

[4] There is nothing in this record to indicate that petitioner was aware of the fact that it was entitled to a $25 refund from the State of Maryland on account of foreign corporation filing fees paid in error, nor is there any indication that any of petitioner's officers or directors knew that the final taxable period from Jan. 1 to June 15, 1962, would give rise to a net operating loss, and a refund claim of $21,594.96 based upon the carryback of that loss to an earlier, profitable year. Petitioner's "final return" was not even filed until Sept. 17, 1962, some 3 months after the 12-month liquidation period had expired, and indeed, on brief, petitioner assures us that neither its officers, directors, nor its attorneys were aware on June 26, 1962, that it had sustained a net operating loss in its final taxable period.

were issued, it is clear to us that there would have been full compliance with the requirements of section 337. Accordingly, since we may not assume on this record that there was failure to make timely distribution of these rights, we must hold that section 337 is applicable here.

It must be remembered that section 337 was enacted to avoid the problems created by such cases as *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, and *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451, and was intended to permit a liquidating corporation to make a tax-free sale of its assets with but a single tax being imposed at the stockholder level without regard to the form of the transaction. H. Rept. No. 1337, 83d Cong., 2d Sess., p. 106A; *Mountain Water Co. of La Crescenta*, 35 T.C. 418, 428. In the typical section 337 case, non-recognition of gain rather than loss is involved, and we should be slow to give a reading to these provisions that would defeat the purpose of the statute. If there is an attempt to transfer assets by the corporation that would be effective as between it and its transferee, we know of no reason why such transfer would not qualify as a distribution under section 337. Otherwise, the operation of the nonrecognition provisions of section 337 might be left hanging in doubt, depending upon possible future receipts, whether based upon contingent, unmatured, or unknown claims. Ironically, the present case involves a loss rather than a gain, but the rule must be the same for both. Petitioner has attempted to bring itself within section 337 for reasons best known to itself, and we cannot find on this record that it has failed to distribute the rights to the tax refunds to its sole stockholder within the statutory 12-month period.

Nor is there any substance to petitioner's argument that it did not follow the procedure approved by Rev. Rul. 63-245, 1963-2 C.B. 144, where it was ruled that a liquidating corporation could divest itself of uncollected claims by transferring them to a trustee for the benefit of stockholders. Certainly, such procedure could have been followed here. But nothing in that ruling makes that procedure mandatory, and nothing therein precludes the use of any other effective method of parting with the corporation's right to receive payment on uncollected claims.

It may also be noted that the actions of the parties confirm the clearly manifested intent of both petitioner and its sole stockholder that all assets of every kind be assigned to the latter. The refund checks in question do not appear ever to have been considered as the property of petitioner, but rather were immediately deposited in the account of the stockholder. In such circumstances, one would not need even a formal, written assignment to give effect to the obvious intention of a corporation and its sole stockholder that all claims held by

the corporation, present or future, become the property of the stockholder upon the expiration of section 337's 12-month period of liquidation. Cf. *Novo Trading Corp.* v. *Commissioner*, 113 F. 2d 320, 322 (C.A. 2).

It is true that petitioner might have delayed the distribution of its real estate or other assets past the June 26, 1962, deadline and thus have avoided the operation of section 337. But the fact remains that petitioner instead endeavored to comply with the requirements of section 337. Nor do we find acceptable petitioner's last-ditch contention that section 337 was intended to apply in the case of losses only where there were offsetting gains and that it was not intended to apply where the liquidating sale produced a single economic loss. There is nothing in the statute that supports any such reading of these provisions. Much as we may sympathize with petitioner's plight, we cannot give section 337 an unreasonable construction merely to extricate it from its own mistake which resulted from a deliberately chosen course of conduct.

2. *Adjustments in Respect of Bad Debt Reserve.*—In determining the 1961 deficiency herein the Commissioner made two separate, but related, adjustments in respect of petitioner's bad debt reserve: (a) He disallowed a deduction for an addition of $12,750 to the reserve claimed in petitioner's 1961 return; and (b) he restored to income the final balance of $63,905.01 in the reserve (after adjustment for the foregoing disallowance) on the theory that petitioner had no further need for the reserve when it sold its business, including accounts receivable, to Maritime pursuant to the contract of June 30, 1961. We hold that his action was correct in both instances.

(a) Section 166(a) of the 1954 Code provides that "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." However, section 166(c) provides, in the alternative, that "in the discretion of the Secretary or his delegate," there shall be allowed "a deduction for a reasonable addition to a reserve for bad debts." Thus, under these provisions, a taxpayer may obtain the benefit of the deduction in advance of actual worthlessness. The Secretary has exercised his discretion under the statute to allow such deductions for additions to a bad debt reserve and has promulgated regulations explaining the conditions under which a deduction is allowable. Section 1.166–4, Income Tax Regs., provides:

(b) *Reasonableness of addition to reserve*—(1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing *at the close of the taxable year of the proposed addition.* * * * [Emphasis supplied.]

In the present case, petitioner had already sold all of its accounts receivable months prior to the close of the taxable year 1961, and its

1961 return discloses that it had no accounts receivable or notes outstanding as of December 31, 1961. In these circumstances, an addition to the reserve for bad debts—which, after all, is merely a forecast of losses from worthless debts which the taxpayer reasonably expects to sustain in future years—would be wholly unwarranted as of the close of the taxable year and would be contrary to the regulations. Petitioner had no debts "at the close of the taxable year of the proposed addition," and it is difficult to perceive any justification for any addition to a reserve for bad debts at that time. The Commissioner's disallowance of the $12,750 deduction was proper, and is in accord with established practice. See *J. E. Hawes Corp.*, 44 T.C. 705, 707; *Ira Handelman*, 36 T.C. 560.

(b) Petitioner's reserve for bad debts at the time of the sale was $76,655.01, including the $12,750 addition which we have held was properly disallowed as a *deduction*. Accordingly, the net balance in the reserve, after adjustment for the disallowed deduction, was $63,-905.01, and the Commissioner has added this amount to petitioner's gross income for 1961. His action in this respect was in accord with well-settled law to the effect that whenever the balance in a bad debt reserve is no longer needed, such balance, which represents deductions actually taken against taxable income in prior years, must be restored to income in the year that the need therefor ceases. *J. E. Hawes Corp.*, 44 T.C. 705; *Ira Handelman*, 36 T.C. 560, 565; *West Seattle National Bank of Seattle*, 33 T.C. 341, 343, affd. 288 F. 2d 47 (C.A. 9); *Citizens Federal S. & L. Ass'n of Cleveland* v. *United States*, 290 F. 2d 932 (Ct. Cl.). In terms of the present case, petitioner has had the advantage of deductions in prior years in respect of the $63,905.01 balance in the reserve account, and since it will not in fact sustain any bad debt losses on its accounts receivable after the sale, that $63,905.01 must be restored to income at the time of the sale.

It is not a matter of consequence that the accounts receivable may have been sold at a loss. Certainly, accounts receivable can be sold like any other asset. If a loss were sustained on the sale, it would not be a bad debt loss and its deductibility would be governed by those provisions of the law dealing with the taxability of gains or the deductibility of losses realized upon sales or exchanges. But it would not justify departure from the general rule that upon sale of the accounts receivable the bad debt reserve in respect thereof must be restored to income. The matter was dealt with clearly and carefully in *J. E. Hawes Corp.*, supra, and we quote in extenso from the opinion therein (44 T.C. 705, 707-709):

Essentially a bad debt reserve constitutes an estimate of the loss which can reasonably be expected to result from worthlessness of debts outstanding at the close of the taxable year. Under the reserve method when specific debts become

worthless they are charged against the reserve and serve to reduce the credit balance therein. Then, if any amount which has been charged against the reserve is subsequently collected the collection does not result in the receipt of income but the amount collected is credited to the reserve. If the credit balance in the reserve at the end of the year is not adequate to cover the reasonably expected loss with respect to the debts outstanding at the end of the year, then an addition is made to the reserve to bring the credit balance to the appropriate amount, and such addition is deductible. *M & E Corporation*, 7 T.C. 1276; *O. P. Lutz*, 29 T.C. 469; *R. Gsell & Co.*, 34 T.C. 41, reversed on another issue (C.A. 2) 294 F. 2d 321; *Ira Handelman*, 36 T.C. 560; and secs. 1.111–1(a)(2), 1.166–1(f), and 1.166–4 of the Income Tax Regulations under the 1954 Code and corresponding provisions of prior regulations. And the general rule is well established that any balance in a reserve for bad debts existing when the reserve becomes no longer necessary must be included in taxable income, since the amount of such balance represents amounts which have been previously deducted. *Geyer, Cornell, Newell, Inc.*, 6 T.C. 96; *West Seattle National Bank of Seattle*, 33 T.C. 341, affd. (C.A. 9) 288 F. 2d 47; *Arcadia Savings & Loan Association*, 34 T.C. 679, affd. (C.A. 9) 300 F. 2d 247; *Ira Handelman, supra;* and cases cited therein.

The petitioner does not dispute this general rule, but contends that it has no application in a situation such as is here presented. The petitioner reasons that the amount of a reserve represents the amount of bad debts predicted and previously deducted and that no amount of such reserve is required to be restored to income unless, by collection of the receivables or the sale thereof, there has been a recovery of the amount which was previously deducted. It states that only to the extent that the receivables are sold at a sum above net value (face value of the receivables less the amount of the reserve), which did not occur here, is there any justification for restoration of the amount of the reserve or any portion thereof to income. It contends that the reserve for bad debts must be charged with the unrecovered sum and that when that is done in the instant case there remains no amount in the reserve to be restored to income.

We cannot agree with this contention of the petitioner. As indicated above, specific debts become a charge against the reserve only to the extent they become worthless.[1] If a debt is sold at a loss prior to being charged off, the loss does not constitute a bad debt loss, but rather a loss upon the sale of property. *Maurice Levy*, 46 B.T.A. 423, affd. (C.A. 2) 131 F. 2d 544, certiorari denied 318 U.S. 780;[2] *Benedum* v. *Granger*, (C.A. 3) 180 F. 2d 564; *Reed* v. *Commissioner*, 45 B.T.A. 1130, affd. (C.A. 4) 129 F. 2d 908; and *Von Hoffman Corp.* v. *Commissioner*, (C.A. 8) 253 F. 2d 828, affirming a Memorandum Opinion of this Court. Cf. *Mac Levine*, 31 T.C. 1121. Hence such a loss is not chargeable against the reserve for bad debts.[3] [Footnotes omitted.]

Thus, if the petitioner sustained any loss upon the sale of its receivables (which cannot be ascertained with certainty upon this record) the reserve for bad debts would not be affected in any way. And the fact that section 337 of the Code would preclude the recognition of any gain or loss upon the sale of petitioner's assets would not affect our conclusion that the reserve must be restored to income, since the income resulting from the cessation of the necessity of maintaining a reserve does not arise from the sale of assets. *Ira Handelman, supra*, and *West Seattle National Bank of Seattle, supra*.

It is true that in *Estate of Schmidt* v. *Commissioner*, 355 F. 2d 111 (C.A. 9), reversing 42 T.C. 1130, the Court of Appeals held that a bad

debt reserve may not be added back to income unless the creditor has "received" consideration upon the sale of debts sufficient to cover the bad debt reserve. With all due respect, we think the Court of Appeals has misconceived the theory that calls for the inclusion of the bad debt reserve in income. It is not that the creditor has "received" something or has "realized" income in the usual sense. Rather, it is an accounting concept that one who has taken a deduction for bad debts in earlier years by reason of his method of accounting, must, in accordance with that method of accounting, restore that deduction to income in a later year when it becomes clear that no bad debt loss will occur. If a different type of loss should occur, as a result of sale, that loss would then be deductible to the extent that and subject to such limitations as the Code prescribes for such losses.

However, the *Schmidt* case is distinguishable here, because we do not find on this record that the accounts receivable were sold at any loss. The sale of the accounts receivable was part of a package deal whereby petitioner sold all of its business assets (except its real estate and its shares in a real estate trust) for the lump sum of $1,950,000. We do not know the amount of accounts receivable included in the sale, nor do we have any evidence as to the value of the other assets sold. We have no way of knowing what allocation of the purchase price could be made with respect to the various assets sold by petitioner to Maritime Corp. While it is true that petitioner attempted, through testimony of a lawyer who participated in bringing about the sale, to show that the accounts receivable were sold at face value minus the reserve, we found that testimony unsatisfying. He relied in great part upon a provision in the contract of sale that petitioner would repurchase any unpaid accounts receivable 1 year later to the extent that such unpaid debts exceeded $72,582.65, which was the balance in the bad debt reserve some 6 months earlier, on January 1, 1961. That provision was in effect merely a limited warranty as to the collectibility of accounts receivable, and in view of the fact that the $1,950,000 paid for all the assets was a lump sum negotiated price for all the assets, without breakdown or evidence of value of the other assets, we cannot say on this record that the accounts receivable were sold at a loss. In the circumstances, we must regard the *Schmidt* case as distinguishable, and we follow the general rule. The balance in the bad debt reserve was properly restored to income.

In order to give effect to the disposition of other issues not presently in controversy,

*Decisions will be entered under Rule 50.*