JOHN T. DODSON, ET AL.,[1] PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4715–66—4719–66.    Filed June 25, 1969.

*John H. Kennett, Jr.*, for the petitioners.
*Douglas O. Tice, Jr.*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Ralph Patrick, docket No. 4716–66; Carey A. Stone, docket No. 4717–66; James P. King, docket No. 4718–66; and Radford Finance Co., docket No. 4719–66.

548

OPINION

In 1964 Radford Finance Co. simultaneously sold all of its assets to the two Piedmont corporations in separate transactions and sub-

sequently liquidated under section 337 [3] of the Code. Respondent has determined that when the assets were sold Radford realized ordinary income derived from the receipt of cash for a covenant not to compete on the part of Radford and its president and general manager, John Dodson. Respondent also determined that when Radford sold its outstanding notes receivable, its need for a reserve for its bad debts account terminated and it had ordinary income in the amount of the reserve's book value.

Petitioners, while admitting that Radford is taxable on any amounts it may have received for a covenant not to compete, deny that it did in fact receive any such amounts. They contend that all amounts Radford received in excess of the values assigned to its physical assets represented payments for its licenses and goodwill. They admit that Radford's reserve for bad debts is includable in income in the years its notes receivable were sold, but contend that the reserve is to be decreased by the difference between the notes value per books and the amount it actually received. We find for respondent on both issues.

As regards the covenant not to compete issue, we preliminarily note that the Fourth Circuit (to which this case would go on appeal) has adopted the "economic reality test" in determining whether any amounts received in the sale of a business represent payment for a covenant not to compete. In *General Insurance Agency, Inc.* v. *Commissioner*, 401 F. 2d 324, 329–330 (C.A. 4, 1968), affirming a Memorandum Opinion of this Court, the court defined the test as follows:

The test or legal standard which we elect to apply in resolving this issue is what has been called the "economic reality" test.[2] Both the Ninth and Third Circuits have held that the determination of whether a part of the purchase price represents payment for a non capital item, i.e., a covenant not to compete,

---

[3] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—
    (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
    (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

(b) PROPERTY DEFINED.—
    (1) IN GENERAL.—For purposes of subsection (a), the term "property" does not include—
        (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,
        (B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a)) of stock in trade or other property described in subparagraph (A) of this paragraph, and
        (C) installment obligations acquired in respect of property (other than property described in subparagraph (A)) sold or exchanged before the date of the adoption of such plan of liquidation.

depends upon whether the parties to the agreement intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement.[3] It is necessary also to establish that the covenant "have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. C.I.R., 294 F. 2d 52, 55 (9 Cir. 1961).

The "economic reality" test is to be contrasted with a test seemingly favored by other Courts of Appeals which has been characterized as the "severable-non severable" rule. See Montesi v. C.I.R., 340 F. 2d 97 (6 Cir. 1965) ; Barran v. C.I.R., 334 F. 2d 58 (5 Cir. 1964) ; Ullman v. C.I.R., 264 F. 2d 305 (2 Cir. 1959). These circuits take the position that if the covenant can be segregated in order to show that the parties were actually dealing with a separate item then so much as is paid for it is ordinary income. Stated in other words, whether any portion of the sales price is attributable to a covenant not to compete depends upon whether the parties treated the covenant as a separate and distinct item. * * * [Footnotes omitted.]

And see *J. Leonard Schmitz*, 51 T.C. 306 (1968), on appeal (C.A. 9).

In the instant case, we have little difficulty in finding that when the two agreements between Radford and the Piedmont corporations were signed, the parties intended to allocate $37,000 for the covenants and that the covenants had an independent basis in fact.

We have found, though the testimony was conflicting, that intense discussions between the parties surrounded the covenants not to compete. When Radford's representatives and Dodson, individually, signed the agreements, they were aware that the purchaser was requiring the covenants and also aware of the precise amounts allocated to them. Thus, there is no question but that the covenants in the amounts enumerated were bargained for at arm's length.

Insofar as it is required that there be a showing that the covenants had independent significance, the evidence established that without the covenants of Radford and especially its president and general manager, Dodson, there was a possibility that Radford and/or Dodson would attempt to reacquire the accounts which were to be transferred and also to compete for new business. Dodson testified that he did not intend to stay in the small loan business, but no evidence was introduced which showed that this intention was caused by anything other than his own preference at the time, which could have subsequently changed.

Petitioners' contention that the $37,000 amount paid was actually for Radford's licenses to do business in Radford and Blacksburg, Va., is unsupported by the record. The agreements do state that the entire transaction hinged on Piedmont Finance of Staunton being able to obtain a license to do business in Blacksburg, Va., but neither the agreements nor any other evidence shows that Radford received any additional amount for helping Piedmont obtain the license.[4]

---

[4] If the proof were otherwise, such amount would seem to have been paid for services, and thus still be ordinary income.

Petitioners alternatively contend that, even if the above agreements have economic reality, the agreements themselves were invalid to convey property—either because Radford's officers had no authority to enter into any agreement calling for any amount to be allocated to covenants not to compete or because the agreements were obtained by fraud. They first point out that the corporate resolution authorizing the sale of Radford's assets included an acceptance only of Interstate Finance's offer, not that of the Piedmont corporations. Further, the resolution authorized the president and secretary to execute instruments and documents to sell the corporation's assets for the agreed purchase price. It did not specifically authorize them to enter into covenants not to compete or to accept any part of the agreed price for such a covenant. Petitioners also argue at length that the resolution itself constituted an acceptance of an offer by Interstate Finance and that all assets were transferred pursuant to the terms of the resolution—not the subsequent agreements. Their conclusion is that since the resolution itself does not allocate any part of the purchase price to a covenant not to compete, or even provide for one, there was no receipt of any amount for such a covenant.

Whether the corporate resolution created a contract of any sort with Interstate Finance, we need not decide, as we find and hold that the definitive provisions of the sale were embodied by the subsequent written agreements with the Piedmont corporations. The testimony of, and the letters exchanged between the individuals representing the principals to the transactions, as well as the language of the resolution itself, establish that the resolution adopted by all of Radford's directors and stockholders contemplated the execution of the agreements with Piedmont, with the provisions therein being binding on all contracting parties.

Wilson (Radford's attorney) testified that he could not remember seeing any copies of the proposed agreements until the day of their signing and that he felt that the transaction was consummated upon the execution of the resolution authorizing Radford's sale to Interstate. However, Bosecker's (Interstate's general counsel) letter to Dodson indicating that a copy of the proposed agreement was enclosed, his notes prepared shortly after a conversation with Wilson, and his testimony at trial, established that Wilson received copies of the proposed agreements with the Piedmont corporations prior to his drawing up the resolution in question. The evidence also established that Wilson and Bosecker had discussed the exact language to be used in the agreements prior to the adoption of the resolution. Furthermore, we cannot believe that any party represented by counsel would intend that the sale of a business, whose assets fluctuated daily, was consummated by a bare agreement on the total consideration to be given and received. As we noted in our findings of fact, both parties felt that a written

agreement was needed in order to consummate the sale of Radford's assets. Dodson's testimony was:

Q. You knew there would be a written contract with this transaction, did you not?

A. That is correct.

Nor can we agree that Dodson and Holland acted in excess of the authority granted to them by the resolution of the stockholders and directors when they agreed to the covenants as written. The authorizing language of the resolution reads as follows:

BE IT FURTHER RESOLVED, that the President and Secretary be, and they hereby are authorized and directed to collect said purchase price of $187,200.00, and to sell and transfer unto said purchaser all the assets, accounts and business of the Radford Finance Co., Inc., and to execute any and all instruments and documents necessary for this purpose, and that all acts of the President and Secretary in the execution of all instruments and documents for the aforesaid purposes be, and the same hereby are ratified, approved and made stable forever, to the end that the aforesaid purchaser shall have legal title to the entire assets, accounts, business and property of the Radford Finance Co., Inc., at both its Radford and Blacksburg offices, in the Commonwealth of Virginia.

Though entering into a covenant not to compete does not constitute the sale of a capital asset, *Cox* v. *Helvering*, 71 F. 2d 987 (1934), affirming a Memorandum Opinion of this Court, its execution does constitute a transfer of an intangible asset—namely the power to earn income from future business operations. Since an intangible asset is an asset of a business as much as any other, its transfer by Dodson and Holland on behalf of Radford is certainly within the scope of the above-cited provision.

Dodson and Holland did sell Radford's assets to the Piedmont corporations rather than to Interstate as the resolution provided. But this action is not necessarily inconsistent with the resolution since both Piedmont corporations were wholly owned by Interstate. Even if the agreements were executed in violation of the resolution, the acceptance of the agreements' benefits by Radford's directors, who were also its shareholders, cures any lack of authority on the part of Dodson and Holland. *Eastern Finance Co.* v. *Gordon*, 179 Va. 674, 20 S.E. 2d 522 (1942); *Fanney* v. *Virginia Investment and Mortgage Corp.*, 200 Va. 642, 107 S.E. 2d 414 (1959).

Petitioners next argue that Taylor's and Bosecker's statements to Dodson, Holland, and Wilson prior to the time the agreements were signed, to the effect that the covenants were only required for record-keeping purposes when in fact they supposedly knew that there were significant tax consequences attached to the allocation of an amount to the covenant, constituted a deliberate misstatement of fact upon which Radford relied to its detriment.

First we do not find that Taylor's or Bosecker's remarks constituted a misstatement of fact. At worst their comments may have led Rad-

ford's representatives to believe that there were no relevant tax consequences attached to the covenants' allocation when their opinion was that the allocation was to the Piedmont corporations' Federal income tax advantage and to Radford's Federal income tax disadvantage. As we pointed out in *Carl L. Danielson*, 50 T.C. 782, 796 (1968), statements pertaining to the ultimate taxation of any particular covenant not to compete can only be opinions in an area of law that is quite complicated. Under such circumstances an individual advising another as to the ultimate tax consequences of a specific covenant is not dealing with a matter of fact and consequently cannot misstate one.

Even if Taylor and Bosecker were misstating a matter of fact, there would still be no fraud. Under Virginia law, which petitioners admit controls in this case, there can be no fraud where the means of ascertaining a fact is equally available to both parties. If a party to an agreement elects to rely on one whose interest it is to mislead him, instead of ascertaining the available information for himself, the law generally will leave him where he has been placed by his own imprudent confidence. *Horner* v. *Ahern*, 207 Va. 860, 153 S.E. 2d 216 (1967) ; *Costello* v. *Larsen*, 182 Va. 567, 29 S.E. 2d 856 (1944) ; *Harris* v. *Dunham*, 203 Va. 760, 127 S.E. 2d 65 (1962). As to the issue under consideration, the relevant "facts" pertained to Federal income taxation, and were available to Radford's representatives. This is especially so as to Wilson, its attorney, who had advised Dodson to sell Radford's assets in bulk for tax purposes. Consequently, under Virginia law, there was no fraud.

We thus find and hold that the $37,000 allocated to covenants not to compete represented payments for covenants not to compete and were thus ordinary income to Radford in the year ended May 30, 1964. In reaching our decision we have applied the strong-proof rule. See *J. Leonard Schmitz, supra.* We note, however, that under the more stringent "Danielson rule" enunciated by the Third Circuit in *Danielson* v. *Commissioner*, 378 F. 2d 771 (C.A. 3, 1967), reversing and remanding 44 T.C. 549 (1965) (urged upon us by respondent), the result would be the same. See *Edmond E. Maseeh*, 52 T.C. 18 (1969) ; *Henry P. Wager*, 52 T.C. 416 (1969).

Turning to the bad debt issue, petitioners contend that that portion of Radford's income which was generated by the termination of its need for a reserve for bad debts is to be reduced by the difference between the sales price of its notes receivable and their book value. This claim must fail.

We have consistently held that when accounts or notes receivable are sold at less than their face value, the difference cannot be considered a bad debt loss offsetting any balance in a reserve (allowance) for bad debts account. *Max Schuster*, 50 T.C. 98 (1968), on appeal (C.A. 2, July 11, 1968) ; *Bird Management, Inc.*, 48 T.C. 586 (1967) ; *J. E.*

560

*Hawes Corp.*, 44 T.C. 705 (1965), and the cases cited therein. As we pointed out in *Bird Management, Inc., supra* at 595, any deductibility of the loss on the sale would be governed by those provisions of the law dealing with the tax consequences of sales or exchanges.

It appears clear that, under section 337(b), the bulk sale of Radford's assets prevents it from recognizing any loss on the sale of its notes receivable. *J. E. Hawes Corp., supra* at 709. But we need not reach that issue here, as we find and hold that petitioners failed to establish their basis in the notes receivable. Radford's books and records were not produced at the trial and in their absence we cannot find that the notes receivables' basis was any less than the amount for which they were sold. We thus uphold respondent's determination on this point.

To reflect the concessions by the respective parties,

*Decisions will be entered under Rule 50.*