HAROLD F. BROOKS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HANNA A. BROOKS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1705-73, 1706-73.     Filed October 1, 1974.

*David G. Stearns,* for the petitioners.
*John E. White,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined that each of the petitioners in these consolidated cases is liable as a transferee of A.C. Neely, Inc., for a deficiency in the amount of $10,618.09, plus interest, for the taxable year ended June 30, 1969. Petitioners have conceded that they are liable for the deficiency, if due, but they challenge the correctness of respondent's determination. The issue is whether respondent erred in his determi-

1

nation that the addition by A.C. Neely, Inc., to its bad debt reserve for the taxable year ended June 30, 1969, was unreasonable and excessive under section 166(c)[1] to the extent of $20,579.41.

### FINDINGS OF FACT

Petitioners Harold F. and Hanna A. Brooks, husband and wife, were legal residents of Edmeston, N.Y., at the time they filed their petitions with this Court. Throughout the 2-year period preceding June 30, 1969, petitioners owned 190 of the 192 issued and outstanding shares of common stock of A.C. Neely, Inc. (hereinafter Neely). Neely was a corporation organized under the laws of New York on July 6, 1956, for the purpose of selling fuel oil in the New Berlin, N.Y., area. Neely maintained its books and records and filed its Federal income tax returns using the accrual method of accounting.

During the taxable years ended June 30, 1968, and June 30, 1969, petitioner Harold F. Brooks (Brooks) was president-treasurer of Neely. Petitioner Hanna A. Brooks was not an officer of Neely's but she worked in its office. Neely's board of directors was composed of Louise S. Goodrich (formerly Louise S. Neely) and Lester R. Mosher, who each owned 1 share of stock, and petitioners.

Most of Neely's customers were farmers or homeowners in the rural area surrounding New Berlin, N. Y. Generally, a homeowner's annual heating bill would average between $350 and $400 per year. Many of them bought heating oil on credit, and Neely was quite lenient in extending credit. Sometimes a customer's credit rating was checked prior to delivery of oil, but in most cases no inquiry was made. The only credit term stated on the monthly statement sent to a customer was that an interest charge of 1 percent per month would be added if the amount due was not paid within 60 days.

Some of Neely's customers used its budget account setup which called for the payment of a regular fixed amount each month rather than for payment for fuel within 60 days of delivery. Neely continued to extend credit to a customer even if part of his account was as much as 6 months old, so long as he continued to make regular payments.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

Neely sent out a monthly statement to each of its customers for payment due on the account. If the customer had not made a purchase in the current month and the account covered only items previously purchased, the statement contained a notation indicating that payment was overdue; otherwise, the same type of statement was sent to all customers. These billing procedures enabled Neely's officers and employees to be familiar at all times with the size and age of each account receivable.

Where an account became inactive and no purchases or payments were made for a period of 60 to 90 days, a series of collection letters, usually three in number, was sent to the customer. If the customer made no response, his account was turned over to an attorney or a credit agency for collection.

In computing its losses on uncollectible accounts for the purposes of determining its income tax liabilities, Neely used a reserve for bad debts as authorized by section 166(c). The following table reflects for each of the taxable years ended June 30 of 1964 through 1969 Neely's accounts receivable outstanding at the end of the year, the sales on account during the year, the amount added to the bad debt reserve, the amount charged against the reserve, and the amount in the reserve at the end of the year.

| TYE June 30— | Accounts receivable outstanding at end of year | Sales on account | Amount added to bad debt reserve | | Amount charged against reserve | Reserve for bad debts at end of year |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Current year's provision | Recoveries | | |
| 1964 | $119,972.83 | $595,545.00 | $6,000.00 | 0 | $3,306.83 | $25,450.71 |
| 1965 | 121,153.55 | 566,507.00 | 2,000.00 | 0 | 2,429.39 | 25,021.32 |
| 1966 | 108,303.56 | 613,663.00 | 4,932.13 | 0 | 1,768.12 | 28,185.33 |
| 1967 | 122,226.77 | 631,816.00 | 0 | $1,653.28 | 3,120.73 | 26,717.88 |
| 1968 | 124,074.89 | 657,810.00 | 10,018.84 | 0 | 3,933.58 | 32,803.14 |
| 1969 | 137,661.13 | 815,391.18 | 27,860.96 | 0 | 2,662.24 | 58,001.86 |

Neely claimed as its deduction for bad debt losses the amount added to the bad debt reserve in each of the years covered by the preceding table. The amount so claimed equaled the total face amount of the accounts receivable turned over to Neely's attorney or a collection agency during the particular year for which the bad debt deduction was claimed.

Sometime in 1966 or 1967, a representative of Agway Petroleum Corp. (hereinafter Agway) contacted Brooks regarding the acquisition of Neely's business. Subsequent negotiations culminated in the execution on June 26, 1969, of an Option To Purchase. This agreement gave Agway an exclusive 90-day option

to purchase Neely's real and personal property, including its accounts receivable. The agreement, which refers to Neely as "Owner," contains the following provisions in paragraph 15 thereof:

All of the Owner's accounts receivables specified and listed in Schedule G attached hereto and made a part hereof is [sic] hereby assigned and transferred to Agway by Owner as of date of closing.

Agway may refuse to accept those accounts receivable of Owner with respect to which collection by attorney or by a collection agency has been commenced, as well as any accounts of Owner in excess of $1,000 deemed undesirable by Agway. In computing the value of those accounts receivables contained in Schedule G attached hereto and made a part hereof, Agway shall pay Owner such amounts according to the age of each account as may be determined by the following schedule:

| Age of account | Percentage of face value of each account to be paid | Age of account | Percentage of face value of each account to be paid |
|---|---|---|---|
| 1 to 30 days | 100 | 1 to 2 years | 25 |
| 31 to 60 days | 90 | 2 to 3 years | 15 |
| 61 to 90 days | 85 | 3 to 4 years | 5 |
| 91 to 180 days | 70 | over 4 years | 0 |
| 181 to 365 days | 50 | | |

This formula for valuing accounts receivable was conceived by the representatives of Agway. It was presented to Neely and first considered by Brooks in March of 1969. Agway did not have access to Neely's accounts receivable for purposes of determining this aging formula.

In order to determine the effect of the formula upon the value of the accounts receivable, petitioners conducted a study of Neely's ledger cards on June 22, 1969. They segregated the cards into age categories as specified in the agreement and valued them strictly pursuant to the formula. Prior to that date, no formal attempt had been made to age Neely's accounts receivable.

As of June 30, 1969, Neely had trade accounts receivable in the face amount of $137,661.13. Between July 1, 1969, and August 4, 1969, Neely collected the sum of $39,625.79 with respect to those receivables, leaving a balance due on them of $98,035.34 on August 4, 1969, the date on which the sale to Agway was consummated. Also, between those two dates, Neely acquired accounts receivable of $27,102.07 generated from sales during that period.

Thus, as of August 4, 1969, Neely had on hand accounts receivable totaling $125,137.41 ($137,661.13 less $39,625.79 plus $27,102.07).

Agway purchased all of Neely's accounts receivable except accounts having a face value of $37,422.45 (all of which had been turned over to its attorney or an agency for collection). The purchase price was determined in accordance with the formula set forth in the above-quoted portion of paragraph 15 of the Option To Purchase agreement,[2] as follows:

| Age of account | Total face amount of accts. rec. | Percentage of face amount paid | Amount paid by Agway |
|---|---|---|---|
| 1 to 30 days | $27,102.07 | 100 | [1] $27,102.07 |
| 31 to 60 days | 10,508.06 | 90 | 9,457.25 |
| 61 to 90 days | 8,734.67 | 85 | 7,424.47 |
| 91 to 180 days | 23,726.34 | 70 | 16,608.44 |
| 181 to 365 days | 11,398.21 | 50 | 5,699.11 |
| 1 to 2 years | 2,959.17 | 25 | 739.79 |
| 2 to 3 years | 677.03 | 15 | 101.55 |
| 3 to 4 years | 57.58 | 5 | 2.87 |
| | 85,163.13 | | 67,135.55 |

[1] The $27,102.07 paid by Agway represented accounts receivable generated from sales by Neely during the period from July 1, 1969, to Aug. 4, 1969.

On its return for the taxable year ended June 30, 1969, Neely claimed a deduction for an addition of $27,860.96 to its bad debt reserve, bringing its balance to $58,001.86 at the end of the taxable year. This addition consists of the aggregate face amount ($7,281.55) of the accounts receivable turned over to an attorney or agency for collection, plus the difference ($20,579.41) between the face amount ($63,164.72) of Neely's accounts receivable as of June 30, 1969, purchased by Agway (reduced by the service charges of $2,551.83) and the amount paid by Agway ($40,033.48) for those accounts.

As shown in the first table set forth above, the balance of Neely's bad debt reserve as of June 30, 1968, was $32,803.14. This amount plus the total face amount ($7,281.55) of the accounts receivable turned over to Neely's attorney or an agency

[2] The accounts receivable total ($137,661.13) as of June 30, 1969, included service charges of $2,551.83. The amount paid by Agway was computed by first adjusting the face amount of the receivables by the service charges and then applying the appropriate percentage to the remaining balance.

for collection during the taxable year ended June 30, 1969, less the amount charged against the reserve in that year ($2,662.24) equals the face amount ($37,422.45) of the accounts receivable refused by Agway.

On July 29, 1969, all of Neely's directors and shareholders formally voted unanimously to sell the corporate assets and completely liquidate within 12 months. On August 4, 1969, Brooks, as treasurer and on behalf of Neely, executed and delivered to Agway a bill of sale covering Neely's tangible personal property. On August 11, 1969, Neely filed with the district director of internal revenue, Buffalo, N. Y., a Form 966 stating that Neely was being liquidated pursuant to section 337.

Petitioners have executed a Transferee Agreement (Form 2045) whereby they have assumed and agreed to pay the amounts of any Federal income taxes finally determined as due and payable by Neely for the taxable year ended June 30, 1969, to the extent of their liability in law or in equity as transferees of Neely's assets.

Respondent determined that the deduction claimed by Neely for bad debts for its taxable year ended June 30, 1969, was unreasonable and excessive in the amount of $20,579.41 and is not allowable to that extent as a deduction under section 166.

OPINION

Section 166(a) permits the deduction of debts which become wholly worthless during the taxable year and, in stated circumstances, debts recoverable only in part, to the extent they are charged off during the taxable year. However, section 166(c)[3] provides that "in the discretion of the Secretary or his delegate" there shall be allowed "a deduction for a reasonable addition to a reserve for bad debts." This provision permits a taxpayer to obtain the benefit of a deduction for his estimated bad debt losses in advance of actual worthlessness. *Bird Management, Inc.,* 48 T.C. 586, 594 (1967).

Under the reserve method provided by section 166(c), the taxpayer includes in his income the full face amount of a receivable on its creation. He then makes "a reasonable addition" to his

---

[3] SEC. 166. BAD DEBTS.

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

reserve for bad debts. This addition reflects an estimate of the losses which can reasonably be expected to result from the worthlessness of debts outstanding at the close of the taxable year. Any additions necessary to replenish the reserve are deductible. When an account receivable becomes worthless during a later year, the reserve account is decreased by the amount of that debt, and no additional deduction therefor is allowed. *Nash v. United States,* 398 U.S. 1, 4-5 (1970); *J. E. Hawes Corp.,* 44 T.C. 705, 707 (1965).

What constitutes "a reasonable addition" to a reserve for bad debts must be determined at the close of the taxable year of the proposed addition. The reasonableness of the addition depends upon whether the balance in the reserve at the end of the taxable year is sufficient to cover the expected worthlessness of outstanding debts. If the balance in the reserve is sufficient for that purpose, no deduction for an addition to the reserve is allowable for the taxable year. *Roanoke Vending Exchange, Inc.,* 40 T.C. 735, 740 (1963); *Platt Trailer Co.,* 23 T.C. 1065, 1070 (1955). The determination must be made in the light of all relevant facts, including the nature of the business, past experience of the taxpayer, conditions of business prosperity, the total amount of debts outstanding at the close of the taxable year, and the total amount of the existing reserve. Sec. 1.166-4(b), Income Tax Regs.; *Lenamon v. Commissioner,* 296 F.2d 844, 846 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court.

As the text of section 166(c) declares, the Commissioner, as a delegate of the Secretary, is vested with a discretion in determining the reasonableness of additions to a bad debt reserve. Where a taxpayer challenges the Commissioner's determination, he has the heavy burden of showing an abuse of that discretion. *Dixie Furniture Co. v. Commissioner,* 390 F.2d 139, 141 (C.A. 8, 1968); *Consolidated-Hammer Dry Plate & Film Co. v. Commissioner,* 317 F.2d 829, 834 (C.A. 7, 1963), affirming on this issue a Memorandum Opinion of this Court. Petitioners' evidence must be weighed accordingly.

In support of the claimed deduction, petitioners emphasize section 1.166-4(b)(2), Income Tax Regs., which provides for errors in prior estimates of bad debt losses as follows:

In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve,

the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.

Petitioners argue that Neely had for years followed a liberal credit policy without carefully examining its accumulation of accounts receivable. They maintain that they were not aware of the infirmities in Neely's accounts receivable until they classified them according to age on Sunday, June 22, 1969. As a result of this discovery, Neely updated its records, "the mechanical vehicle therefor being the inclusion within the current year's bad debt charge of an additional amount representing the difference between the face amounts of certain accounts receivable sold to Agway and the lower amount agreed upon as a realistic present value." In sum, petitioners argue that the additional amount deducted was necessary to correct errors in prior estimates of bad debt losses.

We recognize, as do petitioners, the import of section 1.166-4(b)(2), Income Tax Regs. However, that regulation does no more than pose the factual issue to be resolved: whether the balance in Neely's bad debt reserve was inadequate due to prior errors, so as to justify the $20,579.41 portion of the addition for the taxable year ended June 30, 1969. This sum was the amount of the discount allowed Agway on the sale of the receivables.

We do not think that petitioners have satisfied their burden of proving the inadequacy of the bad debt reserve for the taxable year ended June 30, 1969. At the outset, petitioners err, as a matter of law, in assuming that the discount to be given Agway on the disposition of Neely's accounts receivable justified an addition to the bad debt reserve. We have consistently held that losses stemming from the sale of receivables at a discount are not bad debt losses. Their proper tax treatment depends upon specific provisions of the Code which describe the character, extent, and limitations on the deductibility of such losses. *John T. Dodson,* 52 T.C. 544, 559-560 (1969); *Bird Management, Inc.,* 48 T.C. at 597; *J. E. Hawes Corp.,* 44 T.C. at 708-709.

It is only logical that a taxpayer cannot justify an addition to the bad debt reserve which merely anticipates such a loss. Deductions for additions to a bad debt reserve are intended ultimately to reflect only the amounts actually lost from worthless debts. A discount on the sale of receivables, on the other hand, may reflect a variety of factors, e.g., loss of use of the funds

pending collection of the accounts, the cost and inconvenience of making collections, possible losses attributable to change of ownership of the business, the problem of taking over disputes with dissatisfied customers, and the like. Thus, unless the taxpayer can show that the claimed deduction represents something other than mere anticipation of the loss which he would suffer on the sale of the receivables, his petition must fail.

As we view the evidence, there is no factual basis for equating the discount allowed Agway with anticipated bad debt losses on the accounts receivable. Prior to the year here in controversy, Neely had deducted as an addition to its bad debt reserve a sum equal to the amount of the accounts referred to an attorney or agency for collection. Had Neely, at the end of the taxable year June 30, 1969, the year in controversy, added to the reserve only the amount of the accounts referred during that year to an attorney or agency for collection ($7,281.55), the reserve still would have stood at a figure higher than at the end of any of the 5 preceding years ($37,422.45). The past experience of the taxpayer indicates that the reserve measured in this manner was adequate, and the evidence does not show any real change in business conditions in 1969 adversely affecting the collectibility of Neely's accounts.

The record does not support petitioners' contention that the study conducted on June 22, 1969, resulted in a more realistic estimate of the anticipated worthlessness of Neely's accounts receivable. The formula utilized in the study was conceived by the representatives of Agway who had neither access to the accounts receivable nor prior experience with Neely's accounts. The study was conducted by petitioners with the use of this formula in order to see the effect it would have on the value of the accounts, i.e., to determine the desirability of executing the option agreement.[4] Petitioners did not attempt to apply their own experience in the aging process. Rather, the formula presented by Agway was strictly and mechanically applied. In view of the nature of the Agway formula, the discount simply did not reflect the expected worthlessness of Neely's outstanding accounts receivable.

---

[4] On direct examination by counsel, Brooks described the purpose of the June 22, 1969, "inquiry" as follows: "To find what this formula that Agway was proposing to buy it on, what it was going to do to us. Could we afford to sign the option, or should we stay in business and collect them ourselves."

Under Neely's billing procedures, an account was referred to an attorney or agency for collection if no purchases or payments were made on the account for a period of 60 to 90 days. Since none of the accounts sold to Agway had been so referred, we infer that Neely had made sales or collections within 90 days prior to June 30, 1969, on all the accounts for which the deduction is claimed. Indeed, over one-half ($46,344.80) of the total amount ($85,163.13) of the accounts sold to Agway had been created within the 90 days preceding the aging classification. Active accounts are rarely worthless.

Moreover, the only credit term stated on Neely's monthly statement to an account customer was that an interest charge would be added if the account was not paid within 60 days. This meant the customer could defer payment for 60 days without any penalty. Yet the addition to the bad debt reserve includes a 10-percent discount for accounts (totaling $10,508.06) 31 to 60 days of age.

It is true that nearly 20 percent ($15,091.99) of the accounts purchased by Agway ($85,163.13) were over 6 months of age, but since collections or further sales had been made on each of these accounts within 60 to 90 days, it is difficult to see how a high percentage of the accounts could have been deemed worthless. Furthermore, Neely's customers were permitted to elect to pay their home oil bills, which averaged $350 to $400 per year, on a monthly installment basis. The record contains no information on the amount of the accounts over 6 months of age falling in this category.

We hold that petitioners have not shown that respondent abused his discretion in disallowing the $20,579.41 portion of the addition to Neely's reserve for bad debts. The evidence does not show any real justification for this claimed addition to the reserve.

*Decisions will be entered for the respondent.*