Dock B. Bennett and Frona Bennett, et al. [1] v. Commissioner.
Bennett v. Commissioner
Docket Nos. 5443-68 - 5445-68.
United States Tax Court
T.C. Memo 1970-273; 1970 Tax Ct. Memo LEXIS 87; 29 T.C.M. (CCH) 1230; T.C.M. (RIA) 70273; September 28, 1970. Filed *87 Charles R. Hembree and Philip E. Wilson, Central Bank Bldg., Lexington, Ky., for the petitioners. Juandell D. Glass, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income taxes of petitioners in the years and amounts as follows: Docket No.
Year
Deficiency
Transferee Liability
5443-68
1964
$6,188.82
1965
60.25
1966
198.03
5444-68
12-1-64
$1,000.64
5445-68
12-1-64
1,000.64 After concessions by the petitioners, the only issue is whether the amounts received by petitioners in respect of a covenant not to compete in a contract of sale of an insurance business are taxable as ordinary income or capital gain. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners Dock B. Bennett and Frona Bennett are husband and wife. They resided in Lexington, Kentucky, during the taxable years 1964, 1965, and 1966 and at the time they filed their petitions herein. They filed joint Federal income tax returns for the taxable years 1964, 1965, and 1966 with the district director of internal revenue, Louisville, Kentucky. Bennett Insurance Agency, Inc. (referred to sometimes as "Bennett Insurance" or *88 the "agency"), was incorporated on January 1, 1962, under the laws of the Commonwealth of Kentucky, with its principal place of business located in Lexington, Kentucky. It filed a final U.S. Corporation Income Tax Return, From 1120, for the period January 1, 1964 to December 1, 1964, with the district director of internal revenue, Louisville, Kentucky. The petitioners, Dock B. Bennett ("Bennett") and Frona Bennett, owned all of the capital stock of Bennett Insurance, and were the officers and directors of the corporation prior to the redemption and cancellation of the stock on December 1, 1964. Bennett Insurance was engaged in the general insurance business and sold primarily fire and casualty insurance. It did not sell any life insurance and its heavier volume was in the casualty insurance line. Bennett, who had been in the insurance business for 20 years, had a good reputation in the community and had built up the entire business himself. He served as general manager of the agency and his wife, Frona, served as receptionist. During 1963 the agency earned gross commissions of between $39,000 and $40,000. Sometime prior to December 18, 1963, Mr. Cad Thurman ("Thurman"), an insurance *89 agency broker and friend of Bennett, solicited Bennett to let him attempt to sell the agency's business for a price of two and onehalf times the agency's annual renewable commissions. At first, Bennett refused Thurman's offer, but a short time later, on or about December 18, 1963, Bennett, as president of Bennett Insurance, granted The Commonwealth Agency, Inc., with which Thurman was associated, an exclusive 90-day right to sell the agency for a sum equal to "two times agency commission." Thurman "accepted" the agency agreement on behalf of The Commonwealth Agency, Inc. At the time it was understood by Bennett that Thurman would attempt to sell the agency at two and one-half times the annual renewable commissions of the agency. Thurman negotiated with several prospective buyers of the agency, and, sometime during the latter part of December, 1963, or early January, 1964, Thurman took Dwight Goodwin Tenney ("Tenney"), President of Fayette Security Corporation ("Fayette"), and Jack Reeder ("Reeder"), an associate of Tenney, to meet Bennett to discuss the 1231 sale of the agency. At that meeting it was agreed that the assets and business of Bennett Insurance would be sold to Fayette *90 for two and one-half times the agency's annual renewable commissions, payable over a five-year period. To determine which of the agency's commissions were renewable, for the purpose of establishing the sale price of the agency, Tenney and Reeder sought Bennett's permission to examine the agency's "dailies", the carbon copies of the policies issued by the agency. Since Fayette was then a competitor of Bennett Insurance, Bennett would agree to permit such an inspection of his records only on the condition that there was "a contract, or a firm offer of purchase, or something of this sort". Accordingly, on or about January 18, 1964, Fayette made, and Bennett accepted, a written offer to purchase the agency for a sum of two and one-half times the agency's annual renewable commissions, payable over a five-year period. The written offer also provided for the arbitration of any disputes arising over which policies were to be considered "renewable" for the purpose of setting the ultimate sale price of the agency. The January 18, 1964 writing or agreement was not introduced in evidence; it was preliminary only and the parties intended to incorporate their respective rights and obligations in *91 a final contract to be entered into at a subsequent date. The January 18, 1964 writing did not contain any covenants not to compete nor did it specify any allocation of the sales price among the assets to be purchased. It was nevertheless understood at this time by Bennett and the purchasers that Bennett did not intend to compete with the purchasers and that as part of the sale he would give them a noncompetition agreement. Since Bennett had built up the agency himself and in view of his personal relationship with the customers of the agency, a covenant not to compete was of prime importance to the purchasers. However, no portion of the sales price was allocated to such a covenant as of this time, but a draft of the final agreement prepared thereafter by the attorney for the purchasers in conjunction with the attorney for the seller contained a covenant against competition and made specified allocations of the consideration for such covenant. After the foregoing preliminary agreement of January 18, 1964, Bennett and Reeder made an audit of the agency's "dailies" and the policies were classified as renewable, nonrenewable, or subject to arbitration. A meeting of the shareholders of *92 Bennett Insurance was held on January 31, 1964 for the purpose of approving the sale of the business to Fayette pursuant to a plan of complete liquidation in accordance with the terms of section 337, I.R.C. 1954. The minutes of that meeting state, in part: MINUTES OF SPECIAL MEETING OF STOCKHOLDERS OF BENNETT INSURANCE AGENCY, INC. A special meeting of the stockholders of Bennett Insurance Agency, Inc. was held at the office of the corporation at 2220 Young Drive, Lexington, Fayette County, Kentucky, on January 31, 1964, at the hour of 10:30 a.m., pursuant to the following waiver of notice: * * * Mr. Bennett reported to the meeting that pursuant to action at meetings of the directors and stockholders of the corporation on January 18, 1964, he had pursued negotiations with the Fayette Security Corporation of Lexington, Kentucky looking toward an agreement for the sale of the assets of the corporation to the Fayette Security Corporation. He reported further that the Fayette Security Corporation had made a firm proposal to purchase the assets of Bennett Insurance Agency, Inc. upon the terms and for the price to be determined in accordance with the formula established proposal, and that *93 the proposed form of agreement of sale had been considered by the directors of the corporation at a meeting held at 9:30 a.m. on January 31, 1961, and that the directors had taken action providing for the recommendation to the stockholders that the offer of Fayette Security Corporation be accepted by the corporation and that action be taken by the stockholders to provide for the dissolution of the corporation. Mr. Bennett then presented to the meeting the proposed agreement for the sale of the corporation's assets to the Fayette Security Corporation. Sometime during the afternoon of January 31, 1964, Bennett, Thurman, Frank Gilliam ("Gilliam"), attorney for Bennett and Bennett Insurance, Tenney, Calvert Roszell ("Roszell"), attorney for Fayette, and others associated with Tenney, met in Roszell's office for the purpose of closing the sale transaction. At this meeting, there was presented for the signatures of the parties a proposed sales contract prepared prior to the meeting by Roszell in conjunction with Bennett's attorney, Gilliam. At this meeting the parties discussed the terms of the proposed contract and certain changes were made in the draft. First, 1232 Tenney, on behalf of *94 Fayette, offered to pay a larger portion of the purchase price immediately in cash, with the balance payable in two installments within 15 months, rather than over a five-year period, if, in return, Bennett would reduce the purchase price from two and one-half times annual renewable commissions to two times this amount. Bennett accepted this proposal and the draft contract was amended accordingly. Several other changes were also made in the proposed contract, one by striking a paragraph in respect of credits against the unpaid portion of the purchase price in the event of a breach of contract by the sellers, and another by striking a portion of a covenant by the sellers in respect of the status of outstanding liens against the stockholders and Bennett Insurance at the time of the closing. At some time prior to the execution of the agreement, Bennett insisted that any restrictions on his sale of life, health, and accident insurance be excluded from the terms of the covenant not to compete. The purchasers agreed to this request. Bennett did not raise any objections to the draft other than those embodied in the foregoing changes; the provisions of the draft calling for a covenant against *95 competition and the allocation of consideration in respect of such covenant remained unchanged. After reading the foregoing draft, as amended in the manner indicated above, it was signed by the parties. The final agreement, dated January 27, 1964, provides in part: 1. PROPERTY. The Corporation and Stockholders agree to sell to Buyer the following property for the following consideration: (a) Furniture and Fixtures. All furniture and fixtures set forth in Exhibit "A" hereto attached. (b) Good Will. The good will of the Corporation and the right of Corporation and Stockholders, or any of them, to receive renewal premiums on insurance contracts in force and effect. (c) Restrictive Covenants. The restrictive covenants of Stockholders and Corporation in the form set forth on Exhibit "B" attached hereto and made a part hereof as though set forth at length herein. (d) Customer Records. All customer records and all other records of the Corporation of whatsoever nature, kind or description, pertaining to the assets purchased and the right of access to all other records of the Corporation for a period of one (1) year. 2. PURCHASE PRICE. The purchase price shall be: (a) The sum of $3,200.00; *96 and (b) A sum equivalent to two times normally renewable annual commissions on premiums on policies in effect on February 1, 1964, under an agreed audit by Buyer and Corporation. Should Buyer and Corporation not be able to agree as to the policies includible hereunder, Buyer and Corporation shall each appoint an arbitrator who shall, in turn, appoint a third arbitrator, and the decision of the three arbitrators shall be final and binding on the parties hereto. The term "normally renewable annual commissions" shall mean commissions actually received by Corporation less anything of value received by insured from Corporation during the year of coverage for which the premium was paid. Such policies are set forth on the attached Exhibit "C". 3. ALLOCATION OF PURCHASE PRICE. The said purchase price shall be paid and allocated as follows: (a) Furniture and Fixtures. The sum of Three Thousand Two Hundred Dollars ($3,200.00) shall be paid for furniture and fixtures as set forth on the attached Exhibit "A". (b) Good Will. Fifteen percent (15%) of the amount computed under paragraph 2, subparagraph (b), shall be paid Corporation for good will. (c) Restrictive Covenants. Eighty percent (80%) *97 of the amount computed under paragraph 2, subparagraph (b) hereof, shall be paid for the restrictive covenants, said sum to be paid as follows: Dock B. Bennett 5/7 Frona Bennett 1/7 Bennett Insurance Agency, Inc. 1/7 (d) Customer Records. Five percent (5%) of such sum as computed under paragraph 2, subparagraph (b) hereof, shall be paid to Corporation for all of its records of whatsoever nature, kind or description, pertaining to the assets purchased, and the right of access to all other records of the Corporation for a period of one (1) year. 4. PAYMENT OF PURCHASE PRICE. The purchase price for the assets as set forth above, shall be paid as follows: (a) The sum of Twenty-Five Thousand Dollars ($25,000.00) shall be represented by two notes to the Corporation on which 1233 Dwight G. Tenney shall sign as surety in the sum of $25,000, together with interest thereon at the rate of six percent (6%) per annum, the $5,000 note due fifteen (15) months from date and the $20,000 note due in twelve (12) months with the usual acceleration clause with the right of Payor to pay all or any portion of the principal together with accrued interest at any time. (b) The balance of the purchase price *98 shall be paid in cash on the date of consummation of the agreement as herein provided. * * * 12. DETERMINATION OF FORMULA. The formula set forth in paragraph 2, subparagraph (b) hereof for payment of the purchase price, other than that of furniture and fixtures, shall be determined by actual audit of all of the records of Corporation, which shall be submitted to Buyer after execution hereof. Stockholders and Corporation further agree to allow Buyer to examine any and all other records of Stockholders and Corporation deemed to be pertinent by Buyer to the transaction. 13. USE OF NAME. Stockholders and Corporation, and each of them, do hereby agree that Buyer shall have the exclusive use of the name "Bennett Insurance Agency" for a period of two (2) years from the date of execution hereof. EXHIBIT C This Exhibit represents a book of accounts, the aggregate of premiums of which is $105,475.06, the annual commissions on which are $22,251.48. As to the inclusion of additional accounts, there is a controversy only as to those set forth on the attached Exhibit C-1 which is initialed by the parties. No other accounts are in the contemplation of the parties as being included in this Exhibit *99 for the purposes of the determination of the sale price as set forth in this agreement. If the parties cannot agree as to which accounts on the attached Exhibit C-1 shall be included for such purposes, the same shall be submitted to Cad Thurmond who shall render a decision within ten days from submission thereto and whose decision shall be final and binding on the parties. The restrictive covenants referred to in the agreement as Exhibit "B" and contained in a separate document bearing the date of January 27, 1964, provides in part as follows: AGREEMENT @THIS AGREEMENT, made this 27 day of January, 1964, by and among DOCK B. BENNETT and FRONA BENNETT of Fayette County, Kentucky, herein called Stockholders, BENNETT INSURANCE AGENCY, INCORPORATED, a Kentucky corporation, herein called Corporation, and FAYETTE SECURITY CORPORATION, a Kentucky corporation, herein called Buyer. WITNESSETH: That for and in consideration of the sums of money as more particularly set forth in an agreement among the parties hereto dated January -, 1964, Stockholders, and each of them, and Corporation agree that each of said Stockholders and Corporation shall not engage in a general insurance business or any *100 insurance business of any nature, kind or description, either directly or indirectly, other than life, health and accident insurance, as owner, partner, stockholder, employee, solicitor, or in any other manner, for a period of five (5) years within a fifty (50) mile radius of Lexington, Fayette County, Kentucky, and each of said Stockholders and Corporation shall have no interest of any kind whatsoever in any such business for such period of time within the restricted area set forth above. It is understood and agreed, however, that Stockholders may act as solicitors for Buyer and, in that event, Stockholders shall not be deemed to have violated this agreement in acting in such capacities. Stockholders and Corporation, and each of them, do hereby agree not to divulge to any person whatsoever any information contained in any of the records of the Corporation, including customer and account lists. In consideration of the above, Buyer hereby agrees to pay the sums of money set forth in the said Agreement of January 27, 1964. IN TESTIMONY WHEREOF, the parties hereto have caused this instrument to be executed on this the day and year first above written. ATTEST: /s/ Frona Bennett Secretary *101 ATTEST: [Handwriting /s/ Illegible] Secretary /s/ Dock B. Bennett Dock B. Bennett /s/ Frona Bennett Frona Bennett 1234 BENNETT INSURANCE AGENCY, INC. By: /s/ D. B. Bennett President FAYETTE SECURITY CORPORATION By: /s/ Dwight G. Tenney President On January 31, 1964, Bennett received on behalf of the agency a check from Fayette, payable to the agency, and two notes made payable to the agency. The Bennetts were paid an additional $5,000 at a later time pursuant to Thurman's arbitration of the issue of which policies were renewable for purposes of the sale price. During the period in which the contract of sale was being negotiated and at the time the sale transaction was closed, including the time of the execution of the sales contract, Bennett was represented by counsel. Bennett also consulted a certified public accountant prior to the time he became aware of the terms contained in the contract finally executed on January 31, 1964. As of the time of the trial herein the time period in the above covenant not to compete had expired and Bennett had not reentered the insurance business. The sale of the assets and business of Bennett Insurance to Fayette was made pursuant to a plan of complete *102 liquidation adopted by the petitioners as shareholders, officers and directors of Bennett Insurance, in January, 1964, in accordance with section 337, I.R.C. 1954. On or about December 1, 1964, Bennett Insurance, pursuant to its plan of complete liquidation, transferred all of its then remaining assets to its shareholders, Dock and Frona Bennett, in exchange for the capital stock held by them. The stock was then cancelled. The remaining assets totalling $49,291.44 (consisting of cash in the amount of $39,952.25, fixed assets valued at $2,503.28, and receivables valued at $6,835.91) were shown in the corporate return as distributed equally to petitioners on December 1, 1964 in proportion to their respective stockholdings, leaving the corporation without assets. Bennett Insurance was dissolved pursuant to the laws of the Commonwealth of Kentucky on August 30, 1966. In their joint return for the taxable year 1964, the Bennetts reported as longterm capital gain the amounts received by them in respect of the liquidation of Bennett Insurance upon its sale to Fayette. The total gross sales price is shown as $44,200 and the net long-term gain is shown as $43,200. The Commissioner determined *103 in his notices of deficiency that part of the proceeds received from the Bennett Insurance Agency, Inc. constitute payment for a covenant not to compete, which was part of a contract for the sale of the assets of the company. According to the terms of the contract, the amount of the covenant not to compete is computed to be $39,969.00. [2] * * * Accordingly, the Commissioner ruled that the consideration applicable to the covenant not to compete must be classified as ordinary income rather than long-term capital gain, and he determined further (a) that the Bennetts, as individuals, were directly accountable for those portions of such consideration allocable to them (5/7ths and 1/7th, respectively), and (b) that they were liable as transferees of the corporation for deficiency which resulted against it by reason of like classification of the 1/7th of such consideration allocable to it. Petitioners do not challenge their liability as transferees *104 if the consideration for the covenant not to compete was properly classified. Opinion RAUM, Judge: Under the terms of the sales agreement in question, 80 percent of the sales price is specifically allocated to a convenant not to compete. The covenant referred to is contained in an appendix to the contract and was executed simultaneously with the contract of sale. The petitioners contend that the amount stated in the contract of sale to Fayette as being in consideration for a convenant not to compete was in reality a payment for the good will of Bennett Insurance, taxable as longterm capital gain. The Commissioner maintains that the amount determined to have been paid in respect of the covenant not to compete described as part of the sale agreement is taxable as ordinary income. See Ullman v. Commissioner, 1235 264 F. 2d 305 (C.A. 2), affirming 29 T.C. 129. Where parties have entered into an agreement containing a covenant not to compete, and have provided specifically in their agreement for the consideration therefor, "strong proof" must be adduced to show that the amounts so described are not in fact for such a covenant, taxable as ordinary income. Ullman v. Commissioner, supra at *105 308; Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10), affirming 19 T.C. 718; Schulz v. Commissioner, 294 F. 2d 52, 55 (C.A. 9), affirming 34 T.C. 235, 248-249; Barran v. Commissioner, 334 F. 2d 58, 63-64 (C.A. 5), affirming on this issue 39 T.C. 515, 530; Montesi v. Commissioner, 340 F. 2d 97, 100 (C.A. 6), affirming 40 T.C. 511; Balthrope v. Commissioner, 356 F. 2d 28, 32 (C.A. 5), affirming a Memorandum Opinion of this Court; J. Leonard Schmitz, 51 T.C. 306, 316-318 (on appeal, C.A. 9); Edmond Maseeh, 52 T.C. 18, 22. In applying the "strong proof" doctrine to this case, the question to be resolved is whether the covenant in issue had "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schultz v. Commissioner, supra, 294 F. 2d at 55. Cf. Annabelle Candy Co. v. Commissioner, 314 F. 2d 1 (C.A. 9), rehearing denied, affirming a Memorandum Opinion of this Court; Balthrope v. Commissioner, supra; Benjamin Levinson, 45 T.C. 380; J. Leonard Schmitz, supra; Henry P. Wager, 52 T.C. 416, 419; John T. Dodson, 52 T.C. 544; Edmond E. Maseeh, supra. *106 On the record here, we conclude that the covenant not to compete was a separately bargained for part of the final sale agreement which was of principal economic significance. Certainly, the petitioners have failed to show the contrary, by "strong proof" or otherwise. [3] At the time Bennett first entered into negotiations with Fayette's representatives it was clearly understood that he would enter into a covenant not to compete as part of the sale. Since Bennett had many years of experience in the insurance business in the Lexington area, and since he had personally built up the agency's business and obviously had personal contacts with customers of the agency, such an understanding was of prime importance to the purchasers. However, petitioner argues here that even though he intended to give the purchasers a covenant not to compete, he did not "bargain" with respect to the *107 price of such covenant or otherwise offer to sell his covenant for a specific price. The point has but little merit on this record, which is unsatisfactory in this respect, bearing in mind that the burden of proof was on the petitioners. We have but little confidence in Bennett's self-serving conclusory testimony that there was no bargaining in respect of the covenant. There is hardly any doubt on the evidence that the terms of the agreement including the covenant not to compete, were negotiated on behalf of all parties by counsel representing them, and we note a glaring lacuna in the record in that petitioners' counsel (Gilliam) in these negotiations was not called as a witness before us. Cf. Samuel Pollack, 47 T.C. 92, 108, affirmed 392 F. 2d 409 (C. A. 5), Jean V. Kresser, 54 T.C. 1621. Nor was there any showing that he was unavailable as a witness or that his testimony could not have been taken by deposition. Moreover, since the particular allocation of the consideration for the covenant (5/7 to petitioner, 1/7 to his wife, and 1/7 to the corporation) was obviously of no concern to the purchasers, the inference is strong that such allocation was probably dictated by petitioners' *108 representative. It is clear that the noncompetition agreement was intended to be part of the bargain from the very beginning, that such agreement had substantial value, and that petitioners were represented by counsel in the formulation of its terms. In the circumstances, we regard it a matter of little consequence that petitioner may have learned of the precise terms of such agreement for the first time on January 31, 1964, when the final agreement was executed - an alleged fact about which we have substantial doubt on the evidence and in respect of which we have made no finding -, for petitioner acted with the advice of counsel and the record is clear that he in 1236 fact read the final agreement before he signed it. Further, he did not object to the allocation of 80 percent of the sales price, exclusive of the amount paid for furniture and fixtures, to the covenant. The fact that petitioner may not have seen the final agreement in advance of the time he signed it does not mean, nor do we understand petitioner to suggest, that he was unaware of what he was signing. As the Court stated in Hamlin's Trust v. Commissioner, 209 F. 2d 761, 765: "the effectiveness tax wise of an agreement *109 is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it." Accord: Grant T. Rudie, Jr., 49 T.C. 131, 139. Petitioners argue that the portion of the sale price allocated to the covenant not to compete was so large that the sale price of the business was economically unrealistic in terms of the agency's gross commissions of approximately $40,000 per year. We disagree. The record shows that petitioners' covenant was of great importance to the purchasers and it is a fair inference that the business was of little value to them without the covenant. Although the matter may not be completely free from doubt, we are not prepared to hold on this record that the value attributed by the parties to the covenant was any less than that indicated. Cf. Benjamin Levinson, supra, 45 T.C. at 391. Petitioners have also argued that the allocation to the covenant not to compete was no more than "window dressing", inserted by the purchaser for tax purposes only, and that the transaction between the parties had "crystallized" at the time of the preliminary agreement signed on January 18, 1964. See George H. Payne, 22 T.C. 526. *110 We cannot agree on this record. That preliminary agreement was not produced in evidence, and the record strongly suggests that it was hardly more than a skeleton document binding the purchasers in accordance with a specified overall formula, without breakdown as to the components of the consideration to be paid. The evidence convincingly shows that since Fayette was then a potential competitor of the agency, Bennett insisted on some such binding preliminary writing on January 18, 1964 as a precondition to Fayette's examination of the agency's books to determine the amount of renewable commissions. Though this earlier agreement bound the parties to the sale, the plain inference from the evidence is that it was intended to be preliminary only and that a complete and final agreement remained to be negotiated and executed. Thus, negotiations continued after the January 18th writing, until the afternoon of January 31, 1964, when the agreement here in issue was executed. Indeed, the final agreement not only provided for the covenant against competition that was originally contemplated, but critical changes were made in the overall sale price (two times renewable commissions rather than two *111 and a half times renewable commissions) and the time and manner of payment. Clearly, the final bargain had not "crystallized" on January 18. That occurred on January 31. We conclude that the parties did not reach their final agreement until the time they executed their agreement on January 31, 1964. Accordingly, we cannot uphold petitioner's argument that the final agreement, containing the allocation to the covenant not to compete, should be disregarded as mere "window dressing." Cf. Grant T. Rudie, Jr., supra, 49 T.C. at 139. Petitioners have also argued that no part of the purchase price was "paid" to the Bennetts for their covenants since Fayette's check for the business was made payable to Bennett Insurance. We think that this detail is of no consequence here. Under the contract of sale the Bennetts, as well as Bennett Insurance, were listed as sellers; an allocation of sale price in respect of the covenant was made to them; and the covenant was signed by them as individuals and on behalf of Bennett Insurance. Furthermore, the sale was pursuant to the liquidation of the corporation in which they were the intended distributees and in fact the distributees of the sale proceeds. *112 Thus, the fact that the check was not made out to them does not mean that they were not the sellers of their covenant nor the recipients of the amounts paid therefor. Decisions will be entered for the respondent. 1237 Footnotes
1. Cases of the following petitioners are consolidated herewith: Dock B. Bennett, Transferee, Docket No. 544-68; and Frona Bennett, Transferee, Docket No. 5445-68.↩
2. The record does not disclose the precise total dollar amount of the sales price, but there is no dispute herein that the amount allocated by the Commissioner to the covenant not to compete, $39,969, did in fact represent 80 percent of the actual price.↩
3. Since we hold that the petitioners have failed to establish their position by "strong proof", we need not reach the Commissioner's argument that petitioners' burden in this respect was greater by virtue of the so-called "Danielson Rule" of Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3), reversing 44 T.C. 549↩.