CHARLES W. ROBINSON and ANNE I. ROBINSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robinson v. Commissioner
Docket Nos. 1714-71, 6433-71, 2680-72.
United States Tax Court
T.C. Memo 1973-242; 1973 Tax Ct. Memo LEXIS 46; 32 T.C.M. (CCH) 1130; T.C.M. (RIA) 73242; October 29, 1973, Filed Thomas S. Loop, for the petitioners. Bruce A. McArdle, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined the following deficiencies *47 in petitioners' income tax: Year
Deficiency 1962
$ 22,443.72
1963
8,616.10
1964
34,097.28
1965
21,319.28
1966
11,075.59
1967
67,495.09
1968
2,698.56 2 As a result of concessions made by the parties, or the failure of the petitioners to present any proof with respect to certain adjustments, the questions remaining for decision are as follows: (1) Whether Robinson Lumber Co., Ltd., realized foreign base company sales income which is includable, in part, in the taxable income of the petitioners for the taxable years 1963 and 1964 under section 951. [1]
(2) Whether the petitioners realized gain in the taxable year 1965 on account of the sale of 14,377 shares of the stock of Nicaraguan Long Leaf Pine Lumber Co., Inc., to Adela Investment Co.
(3) Whether the basis for computing gain or loss on the sale of certain lots by the petitioners should include the amount of $500 paid as a special assessment on account of their membership in the Timberlane Country Club adjoining said lots. (4) Whether petitioners are entitled to deduct *48 expenses attributable to certain residential property located in Highlands, North Carolina, in excess of the income therefrom for the taxable year 1968. 3 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Charles W. Robinson and Anne I. Robinson (hereinafter collectively referred to as "petitioners") are individuals who were legal residents of New Orleans, Louisiana, at the time their petitions were filed in each of the cases which are the subject of these proceedings. Petitioners' Federal income tax returns for each of the taxable years 1962 to 1968, inclusive, were filed with the district director of Internal Revenue for the New Orleans District, New Orleans, Louisiana. Nicaraguan Long Leaf Pine Lumber Co., Inc. (hereinafter referred to as "NIPCO") is a corporation organized under the laws of the Republic of Nicaragua. During the period January 1, 1961 through September 14, 1964, the shares of NIPCO were legally and beneficially held and owned as follows: Stockholder
Shares Charles W. Robinson
29
John T. Robinson
29
Samuel S. Robinson
29
Robert Robinson, Jr.
13
Total
100
*49 4 On September 15, 1964, the shares of stock in NIPCO held by John T. Robinson, Samuel Robinson, and Robert Robinson, Jr., were acquired by Charles W. Robinson (hereinafter referred to as the "petitioner"), P. Q. Brewer, and R. C. Goyenche. In order to finance the acquisition of the additional shares of stock in NIPCO, petitioner borrowed the sum of $650.000 from the Whitney National Bank, New Orleans, Louisiana, pledging the stock as collateral to secure the loan. Subsequent thereto, the NIPCO stock was split at the ratio of one-thousand for one. As a result, the shares of NIPCO were legally and beneficially held and owned as follows: Stockholder
Shares Charles W. Robinson
69,831
P. Q. Brewer
25,871
R. C. Goyenche
4,298
Total
100,000
At all times subsequent thereto, the number of shares of NIPCO stock issued and outstanding was 100,000 shares. 5 Robinson Lumber Co., Ltd. (hereinafter referred to as "Limited") was a corporation incorporated under the laws of British Honduras with its principal place of business at Belize, British Honduras. All of the stock of Limited was owned by NIPCO. Limited was engaged in the business of operating *50 a lumber yard at Belize, where logs were purchased and cut for resale to NIPCO and Robinson Lumber Co., the partnership, which at one time owned the stock of NIPCO. The logs purchased by Limited were generally obtained from so-called "contractors" who operated crews to cut and remove the logs from the forest for delivery to Limited. In order to obtain such logs, it was necessary for Limited to advance funds to the contractors in order to meet the costs of their operations. Purchases of logs from the contractors would be credited to their respective accounts in order to offset such advances. As of December 31, 1962, the books and records of Limited reflected advances to contractors totaling B.H. $757,074.50. [2] 6 The net income of Limited as reflected on its books and records without any adjustment for advances to contractors which were uncollectible for the years ended December 31, 1959 to 1964, inclusive, was as follows: 1959
B.H. $ 22,199.81
1960
43,143.82
1961
3,490.25
1962
(29,874.00)
1963
14,522.59
1964
58,911.19
In addition thereto, the records *51 showed an accumulated deficit from operations as of December 31, 1962, in the amount of B.B. $367,504.45. For the years ended December 31, 1963 and 1964, the debits and credits thereto per books were as follows: Deficit 12/31/62
B.H. $367,504.45
Less: Net income per books:
14,522.59
Deficit 12/31/63
B.H.$352,981.86
Less: Net income per books:
58,911.19
Deficit 12/31/64
B.H. $294,070.67
Add: Provision for additional loss - 1964:
20,533.80
Deficit 12/31/64
B.H. $314,604.47 7 An examination of the accounts of Limited was made by the firm of Miron & Carrera, Economists and Public Auditors, Guatemala, C. A., for the period from January 1 to September 30, 1964. In the report of said examination dated February 22, 1965, accounts due from contractors as shown on the books and records of Limited amounted to B.H. $947,520.29, on account of which said auditors proposed to set up a reserve and to charge to operations the sum of B.H. $301,540.73 as a reserve for uncollectible accounts, including a reserve for B.H. $101,281.33 out of a total of B.H. $133,831.83 carried on the books as due from Hoy Brothers, which Hoy Brothers did not recognize. The proposed *52 charge was not made on the books of Limited. As of May 31, 1967, Limited ceased to do business. [3] As of that date, the books and records showed a total of B.H. $652,772.48 due from contractors against which 8 there was a reserve of B.H. $235,331.53. The books and records further reflected an accumulated deficit in earnings amounting to B.H. $691,621.58, consisting of the following: SURPLUS ACCOUNT BALANCE 12/31/65
B.H. $250,751.52
Uncollected Account
305,538.53
Provision for Uncollectible Account
135,331.53
$691,621.58
None of the remaining amounts due from contractors as of May 31, 1967, were collected by Limited or by any other person on behalf of Limited or NIPCO. In other words, with the cessation of business, any balances due which might otherwise have been collectible became uncollectible. The parties have stipulated that total advances of B.H. $813,688.46 to logging contractors became worthless in the taxable years 1965, 1966, and 1967. Such advances dated back, in part, to prior years. *53 As of May 31, 1967, Limited has received advances from NIPCO totaling B.H. $1,072,480.78. Such advances exceeded the assets of Limited and were largely uncollectible. 9 The losses sustained by Limited for the years ended December 31, 1959 to 1964, inclusive, on account of advances to contractors were in excess of the net income of Limited for said years as reflected on its books and records. When an appropriate charge is made to income in order to reflect such losses, it is clear that Limited did not realize any foreign base company sales income for the calendar years 1963 and 1964. October 1, 1965, the petitioner, on behalf of himself and his co-shareholders in NIPCO, entered into an agreement with Adela Investment Co. S.A. (hereinafter referred to as "Adela") whereby his co-shareholders agreed to sell and Adela agreed to purchase 25,000 shares of NIPCO stock for $30 per share, the total purchase price thereof being $750,000. Pursuant thereto, on or before October 29, 1965, said 25,000 shares of stock of NIPCO were duly transferred and delivered to Adela, of which 14,377 shares represented stock owned by the petitioner and the balance represented stock owned by *54 his co-shareholders. 10 Subsequent to the transfer of 25,000 shares of NIPCO stock to Adela during 1965, these shares were wholly controlled and voted by Adela. On November 8, 1965, the petitioner deposited to his account at the Whitney National Bank, Account No. 44-300-227, a draft from the Enskilda Bank, Stockholm, Sweden, in the amount of $750,000, which had been received in payment for said stock by Adela. In addition to the foregoing, during the taxable year 1965, the petitioner transferred 707 shares of NIPCO stock to others and transferred 1,037 shares of NIPCO as commissions relating to the sales of the 14,377 shares and the 707 shares, making a total of 16,121 shares of NIPCO stock sold or transferred by the petitioner in said year. The petitioner's basis for said stock was $8.62 per share. The agreement of October 7, 1965, pursuant to which petitioner and his co-shareholders transferred the 25,000 shares of stock of NIPCO to Adela, contained 11 a provision granting Adela the option to require the seller to repurchase said stock as follows: Seller's Agreement to Repurchase the Shares Section 5.1 ADELA'S Option In consideration of ADELA'S agreement *55 to purchase the Shares and in order to induce ADELA to carry out the acquisition promptly and the other mutual covenants and agreements of the parties contained herein, the Seller agrees that ADELA shall have the right and option, by ADELA giving to Seller written notice of the exercise of such right and option at any time prior to April 30, 1967, to sell to Seller and require Seller to purchase, and the Seller agrees to purchase, all of the Shares of the Corporation purchased by ADELA hereunder at a price equal to the price paid for such Shares by ADELA pursuant to this Agreement plus interest at the annual rate of 9%, net of any taxes on such purchase price, from the date ADELA acquired such Shares until the date of payment by Seller to ADELA of such price upon the Seller's repurchase of the Shares. The said purchase (or repurchase) and sale pursuant to ADELA's exercise of the option shall be consummated at the offices of the Corporation (or such other place as the parties shall mutually agree) on the 90th business day following the giving of such notice by ADELA. At such date, ADELA shall deliver the Shares duly endorsed in blank for transfer against payment of the purchase (or *56 repurchase) price therefor in full by certified check of Seller or bank draft payable to ADELA. 12 In order to secure compliance with the aforesaid agreement to repurchase, the petitioner was required to pledge an additional 50,000 shares of NIPCO stock to secure repayment of the purchase price of $750,000 in the event that Adela exercised its option. In their original income tax return for the taxable year 1965, filed June 15, 1966, petitioners reported a long-term capital gain of $286,833.23 on account of the sale in that year of the stock of NIPCO, computed as follows: CAPITAL GAINS-JOINT VENTURE:
Shares
Amount Sale after June 1965-Stock of Nicaraguan Long Leaf Pine Lumber Co., Inc., Puerto Cabezas, Nic. at $30.00 per share
26,229
$786,870.00
Cost-September 15, 1964-$8.62 per share
226,094.00
Net Gain
$560,776.00
Expenses:
Stock paid as Commissions-1803 shares at $8.62 a sh.
$15,542.00
Expenses of Sale
46,463.00
62,005.00
Net Gain
$498,771.00
DISTRIBUTION
Percentage
P. A. Brewer, %NIPCO, Puerto Cabezas, Nic.
36.439%
$181,747.16
R. C. Goyenche, 1423 Jackson Ave., New Orleans, La.
6.053%
30,190.61
C. W. Robinson, 1803 Jefferson Ave., New Orleans, La.
57.508%
286,833.23
Total
100,000%
$498,771.00
*57 13 On or before April 30, 1967, the time within which Adela might exercise its right to have the seller repurchase the 25,000 shares of stock of NIPCO pursuant to the aforesaid agreement was extended to December 31, 1967. On or before that date, Adela requested a further extension which request was not granted by the petitioner. The option thereupon expired.
In an amended income tax return for the taxable year 1965, filed on June 17, 1968, petitioner claimed that $273,393.73 of said long-term capital gain of $286,833.23 included in petitioner's original return for the taxable year 1965 as the gain on the sale of stock to Adela was not realized in the taxable year 1965 for the reason that the sale was not completed until December 31, 1967. On September 11, 1959, petitioners purchased real estate known as Lot Nos. 42 and 43, Timberlane Estates. The acquisition of a lot in Timberlane Estates did not in and of itself grant stock ownership in Timberlane Country Club, Inc., or membership in Timberlane Country Club. 14 Prior to their purchase of any lots in Timberlane Estates, petitioners purchased a share of stock in Timberlane Country Club, Inc., at a cost of $1,500. *58 As a result of the ownership of the share of stock in Timberlane Country Club, Inc., petitioners were granted membership therein. Charles Robinson was an original member of the Country Club, its original treasurer, and a member of the Club's board of directors. Pursuant to a special assessment against their share of stock in Timberlane Country Club, Inc., petitioners, by check dated February 28, 1963, paid Timberlane Country Club, Inc., $500. Petitioners, in 1964, sold Timberlane Estates Lot No. 42 and one-half interest in Timberlane Estates Lot No. 43 for the total amount of $16,946.20. They had previously, in 1962, sold the other one-half interest in Lot No. 43. Neither petitioners' share of stock in Timberlane Country Club, Inc., nor their membership in such 15 Country Club were transferred upon the sale of a one-half interest in Lot No. 43 in 1962 or upon the sales of Lot No. 42 and the remaining one-half of Lot No. 43 during the year 1964. As of the date of the trial of these cases, May 22 and 23, 1973, petitioners retained their ownership of stock in Timberlane Country Club, Inc.
Petitioners seek to include the sum of $500 paid to the special assessment *59 against their share of stock in Timberlane Country Club, Inc., as part of their basis in Lot Nos. 42 or 43, Timberlane Estates. Petitioners acquired Westcliff, a mountain vacation property, located in Highlands, North Carolina, in 1953. The property consisted of a main house, servant quarters, and a guest house. The property was acquired by petitioners with the intention that it be used solely for their personal purposes as a family summer vacation retreat. Westcliff was availed of solely for the personal use of petitioners and their family from its acquisition 16 until 1961. The property was rented in part from time to time thereafter. The following schedule indicates the income and expenses claimed by petitioners with respect to Westcliff on their Federal income tax returns (Forms 1040) for the years 1962 through 1968: Year
Income
Expense
Personal
Commission
Loss 1962
$1,000.00
$2,773.24
$ 924.41
$50.00
$ 898.83
1963
50.00
2,878.32
992.77
-
1,835.55
1964
50.00
2,770.66
923.55
-
1,797.11
1965
-0-
2,933.49
977.83
-
1,9 55.66
1966
540.00
2,891.98
789.99
-
1,561.99
1967
540.00
3,987.63
1,329.21
-
2,118.42
1968
740.00
3,196.15
532.68
-
1.923.47
*60 During the years 1963 and 1964, the sole rentals form Westcliff were $50 per year from 2 weeks' rental in each year of the guest cottage. The main house at Westcliff was not rented during the years 1963 or 1964. There were no rentals of Westcliff, main house or guest house, during 1965. During each of the years 1962 through 1968, Westcliff was availed of for their personal use by Charles and/or Anne Robinson and their children for vacation periods varying from 2 weeks to 3 months. 17 During 1964 and 1965, Mrs. Robinson and some of her children vacationed at Westcliff during the months of June, July, and August (1964) and 28 days during June and July (1965). The main house and guest house were empty and no prospective buyers or renters were shown the property during the remainder of those summers. The Robinson family also vacationed at Westcliff for most of the summer of 1966 and 3 weeks during 1967. During the taxable years 1962 to 1968, inclusive, the property was listed for sale with local realtors. From time to time, the property was advertised for sale in metropolitan newspapers. The respondent disallowed the deductions with respect to Westcliff for the year *61 1968 in excess of the income received therefrom on the ground that the property, which was acquired by petitioners for personal use, had not been converted by petitioners to a profit motivated activity. 18 OPINION From its incorporation in 1957 until it ceased to do business on July 31, 1967, Limited was a corporation organized under the law of British Honduras. All of its stock was owned by NIPCO. During the years before the Court, the stock of NIPCO was owned in varying percentages by the petitioner. Limited was engaged in the operation of a saw mill and lumber yard in Belize, British Honduras. All of its lumber sales were made either to NIPCO or to Robinson Lumber Co., the partnership, which at one time owned the stock of NIPCO. The parties concede that Limited was a controlled foreign corporation within the meaning of section 951, the income of which was taxable to its United States shareholders. The percentages of such income taxable to the petitioner, if there was any income during the years in question, has also been agreed to by the parties. This leaves the question whether during the taxable years 1963 and 1964 Limited realized such 19 "foreign *62 base company sales income" within the meaning of section 954(d) which might be attributable to the petitioner. [4] The respondent has now conceded that such income was not realized in subsequent years. *63 20 In support of his position, the respondent relies on pro forma statements prepared from the books and records of Limited showing income of B.H. $14,522.59 for the year ended December 31, 1963, and B.H. $58,911.19 for the year ended December 31, 1964. 21 In order to obtain its logs, Limited was required to advance funds for the operations of various logging contractors. These advances were repaid out of the proceeds of the sale of such logs to Limited, leaving an unpaid balance which was carried over from year to year. Notwithstanding such balances, if Limited was to obtain any additional logs from these contractors, it was required to advance additional funds for their current logging operations. Thus, while there was a "running account" with the contractors, it was clear that such account would never be liquidated so long as Limited remained in business and that any balance due when it ceased to buy logs from the contractors would be wholly uncollectible. No effort was made in the preparation of the income statement for the years 1963 and 1964 to set up a reserve for losses on account of advances by Limited to its logging contractors. Nevertheless, independent *64 auditors who examined the records of Limited, and made an investigation of the collectibility of such accounts, proposed to establish a 22 reserve which would have wiped out any income shown on the books and records of Limited from the inception of its business to December 31, 1964. The parties have stipulated that total advances of B.H. $813,688.46 to logging contractors became worthless in the taxable years 1965, 1966, and 1967. Such advances dated back, in part, to prior years. When we consider the record as a whole, it is apparent that if the advances to the logging contractors are taken into account Limited never realized any income from its operations. It never paid any income taxes to British Honduras. It never remitted any funds to NIPCO, its parent corporation. When Limited ceased to do business, it owed NIPCO a total of B.H. $1,072.480.78 which was largely uncollectible. At the trial, respondent remarked that notwithstanding Limited's losses, substantial profits were realized by NIPCO and by Robinson Lumber Co. (the partnership) on the resale of lumber purchased from Limited. Presumably, such profits had been reflected in determining the tax liabilities of *65 the partners and shareholders of NIPCO. No effort has been made by the 23 respondent to reallocate income as between either the partnership or NIPCO and Limited. In the absence of such reallocation, it clearly appears that no earnings were ever realized by Limited. With respect to the sale by petitioner of 14,377 shares of the stock of NIPCO to Adela, the transaction was cast in the form of a completed sale of stock subject to the absolute right of the purchaser to rescind. In its practical effect, however, the transaction has both the elements of a sale of stock and of a loan of funds. The respondent argues that Adela acquired ownership and control of the stock in the year of sale and that the petitioner is therefore accountable for tax purposes on the resulting gain in that year. The petitioner contends, on the other hand, that looking to the substance of the transaction there was nothing more than a loan or deposit of the purchase price pending a decision by Adela as to whether or not it would buy the stock. 24 Petitioner admittedly used the funds realized from the purported sale to pay off his loan with the Whitney National Bank and thereby obtain a release *66 of the NIPCO stock. On the other hand, Adela had the absolute right to return the stock to the petitioner at any time up until December 31, 1967, and demand repayment of the purchase price, plus interest. Thus, insofar as the petitioner was concerned, while the price to be paid for the stock had been credited to his account with the Whitney National Bank, and was thus constructively received by him, there was no assurance that the petitioner would not be called upon to refund the amount paid. As the parties state the issue, it is unnecessary to decide whether in the application of the so-called claim of right doctrine, there is any distinction between amounts received on account of the sale of property and income from other sources. See Consolidated-Hammer Dry Plate & Film Company v. Commissioner, 317 F.2d 829 (C.A. 7, 1963); Boyce v. United States, 405 F.2d 526 (Ct. Cl. 1968). In fact, 25 this Court has not made that distinction. See Eugene H. Walet, Jr., 31 T.C. 461 (1958). If the transaction is in substance a "loan," the fact that petitioner had control over the disposition of the borrowed funds is immaterial. Any borrower would *67 have such control. Upon the basis of the facts presented, however, we are unable to find that as of the close of the taxable year 1965, the petitioner was indebted to Adela on account of the $750,000 received as the purchase price of the NIPCO stock. Such indebtedness would only arise if and when Adela elected to exercise its option and tendered the stock to the petitioner with the demand for payment. While the buyer had the option to rescind the sale, there was no assurance that the buyer would elect to do so. The resulting gain was thus properly reported by the petitioner in the year that the stock was delivered to the purchaser and the purchase price was received. With respect to the claim by the petitioner that in computing gain from the sale of the Timberlane lots, he is entitled to include in his basis an assessment 26 of $500 against the members of the Timberlane Country Club, we find no merit. As the facts clearly show, ownership of the lots did not carry with it membership in the Club. The petitioner presently retains such membership. Petitioner acquired a vacation property in Highlands, North Carolina, in 1953. The property consisted of a main house, servants' *68 quarters, and guest house. Beginning in 1962, the guest house, and occasionally the main house, was rented for short periods of time. From time to time, beginning in 1962, the property was listed and advertised for sale. During the taxable years 1962 to 1968, inclusive, the petitioners have allocated a portion of expenses of the property to their personal use and deducted the balance in excess of rental income as expenses incurred for the production of income. The respondent contends that the property was not rented for the purpose of producing any income. With respect to this issue, petitioners fail to distinguish between such expenses as may be incurred in the maintenance of property which no longer 27 constitutes a taxpayer's residence, but is being held for the production of income, and those expenses incurred in connection with a taxpayer's second home which is offered for rental when not otherwise in use. This was not an "abandoned home," such as was involved in Mary Laughlin Robinson, 2 T.C. 305 (1943). The petitioners have lived in the property themselves from time to time up to and including the year of sale. Looking at the facts in the most favorable *69 light to the petitioners, the most that can be said is that petitioners had from time to time offered the property for sale and, in the interim, were using the property as a personal residence. When not in use, the property was offered for rental. The income which could have been realized from incidental rentals would never exceed the expense. Under such conditions, it cannot be said that the property was held as rental property for the production of income. Carkhuff v. Commissioner, 425 F.2d 1400 (C.A. 6, 1970). Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. British Honduras dollars (B.H.) with a conversion ratio of $1.43 B.H. to $1.00 U.S.↩
3. While it appears that transactions may have continued until July 31, 1967, such transactions were in liquidation of the business. ↩
4. Section 954(d) provides, in part, as follows: SEC. 954. FOREIGN BASE COMPANY INCOME. * * * (d) Foreign Base Company Sales Income. - (1) In general. - For purposes of subsection (a) (2), the term "foreign base company sales income" means income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with the purchase of personal property from a related person and its sale to any person, the sale of personal property to any person on behalf of a related person, the purchase of personal property from any person and its sale to related person, or the purchase of personal property from any person on behalf of a related person where - (A) the property which is purchased (or in the case of property sold on behalf of a related person, the property which is sold) is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized, and (B) the property is sold for use, consumption, or disposition outside such foreign country, or, in the case of property purchased on behalf of a related person, is purchased for use, consumption, or disposition outside such foreign country. * * * (3) Related person defined. - For purposes of this section, a person is a related person with respect to a controlled foreign corporation, if - (A) such person is an individual, partnership, trust, or estate which controls the controlled foreign corporation; (B) such person is a corporation which controls, or is controlled by, the controlled foreign corporation; or (C) such person is a corporation which is controlled by the same person or persons which control the controlled foreign corporation. For purposes of the preceding sentence, control means the ownership, directly or indirectly, of stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote. For purposes of this paragraph, the rules for determining ownership of stock prescribed by section 958↩ shall apply.