JOHN L. BECKLEY and ELEANOR H. BECKLEY, et al., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Beckley v. CommissionerDocket Nos. 5421-72, 5422-72 and 5423-72.United States Tax CourtT.C. Memo 1975-37; 1975 Tax Ct. Memo LEXIS 337; 34 T.C.M. (CCH) 235; T.C.M. (RIA) 750037; February 27, 1975, Filed Allan Shoopak, for the petitioners. Lyndon J. Parker, for the respondent. IRWINMEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: DocketTaxablePetitionersNo.Year EndingDeficiencyJohn L. Beckley5421-7212-31-68$ 8,269.87Eleanor H. Beckley12-31-6910,090.54The Economics Press,5422-723-31-689,210.95Inc.The Economics Press,5423-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,852.54Inc. and Nemo3-31-709,403.74Realty Corp. (Sub-sidiary Company)The issues presented for our determination are: (1) whether respondent erred in disallowing deductions taken by the corporation for pilot training and for the use, maintenance and depreciation of two airplanes; (2) whether the fair rental value of the two airplanes as applied to the hours of personal use constitute a constructive dividend to petitioner John L. Beckley; and (3) whether respondent erred in disallowing a portion of the corporation's additions to its bad debt reserves. FINDINGS OF FACT *339 Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly. Petitioners, John L. Beckley and Eleanor H. Beckley, husband and wife, resided in North Caldwell, N.J., during the years in issue and at the time of the filing of their petition with this Court. For the calendar years 1968 and 1969 joint income tax returns were filed with the district director of internal revenue in Newark, N.J. Petitioner, the Economics Press, Inc. (hereinafter referred to as the corporation or Economics Press) is a corporation dealing primarily in the publication of training and instructional materials for corporations and education systems. During the years in issue and at the time of the filing of its petitions with this Court, Economics Press maintained its principal place of business and sole corporate headquarters in Fairfield, N.J. For the taxable years ending March 31, 1968, March 31, 1969, and March 31, 1970, corporate income tax returns were filed with the district director of internal revenue in Newark, N.J.During the years in issue John L. Beckley (hereinafter referred to as petitioner or Beckley) was the president, *340 editor, chief writer, chairman of the board, and principal shareholder of Economics Press with all of the corporation's publications being either created, rewritten or edited by him. As the corporation grew in size Beckley found it increasingly difficult to set aside the uninterrupted time he required for his creative writing. In order to obtain the solitude he deemed necessary Beckley determined that he needed a place to work away from his Fairfield office. As a result he set up a study in his wife's summer house in Chatham, Mass. (Cape Code area). The house was situated in a secluded sixacre wooded area and there Beckley found the uninterrupted time he needed to create new products for the corporation. While Beckley believed he could work just as effectively elsewhere provided he had the necessary seclusion, his wife and family preferred Chatham for their summer residence. In July 1967 Economics Press purchased a single engine Beechcraft V35 Bonanza airplane. This plane was traded in 1968 for a twin engine Beechcraft B55 Baron. The corporation acquired the planes for the primary purpose of transporting Beckley between the Chatham summer house and the Fairfield office. Beckley was*341 trained at the corporation's expense to pilot the planes and he found that flying gave him greater mobility while still allowing him to maintain frequent and immediate contract with his Fairfield office whenever necessary. During the summer Beckley would spend at least five days a week in Chatham with the other two days a week being spent in the Fairfield office. The planes were used for this travel. Beckley found it too time consuming and inconvenient to travel by commercial or charter flights. Beckley was also a member of the board of trustees of the University of Vermont and used the planes to attend some of the university meetings. No evidence was presented indicating that Economics Press engaged in any business with the University of Vermont or that Beckley's position as a trustee was business related. The airplanes were also used by Beckley to contact customers, sales representatives and writers in addition to some personal travel. The use of the planes may be summarized as follows: 7-10-67 2 -4-1-68 -4-1-69 -3-31-683-31-693-31-70Training and maintenance100.93 hrs.54.09 hrs.3.50 hrs.flightsChatham summer house45.1819.50tripsUniversity of Vermont19.2525.40tripsBuck County and/or Balti-2.371.67more trips to seeartist/writer on print-ing and mailing businessTrip to see customers/32.47writers in Atlanta,Houston, CaliforniaTrip to Northeast to see3.73writers/sales repre-sentativesTrip to South:business10.80personal16.18Personal Florida trip16.87Other trips26.00178.64 hrs.118.52 hrs.80.78 hrs.*342 For the taxable years ending March 31, 1968, March 31, 1969, and March 31, 1970, Economics Press claimed deductions for pilot training, and for the use, maintenance and depreciation of the airplanes in the respective amounts of $ 9,673, $ 14,827 and $ 16,921, all of which were disallowed by respondent. For the same taxable years Economics Press claimed deductions for additions to its reserve for bad debts in the respective amounts of $ 23,696.91, $ 13,055.43 and $ 13,605.60. Respondent disallowed $ 3,786 for the taxable year ending March 31, 1968, and $ 1,091 for the taxable year ending March 31, 1970. During the years in issue and some of the years prior thereto the corporation used one percent of sales as the basis for its bad debt reserve. For the years 1962 through 1969 the corporation's trade notes/accounts receivables, sales on account, additions to reserve, recoveries, charges against reserve and reserve for each year were reported on its returns as follows: Additions to ReserveTradeCurrentChargesNotes/AccountsSales onYear'sAgainstReserve forYearReceivableAccountProvisionRecoveriesReserveBad Debts1962$ 61,340.32$ 665,151.39$ 2,689.04$ 6,859.45196390,686.14842,338.21$ 8,501.966,946.898,414.521964150,782.961,060,025.259,207.467,021.7310,600.251965156 ,271.861,305,855.7911,768.419,310.1013,058.561966244,664.871,631,300.1917,882.5614,781.2216,195.9 01967261,438.271,894,976.7923,696.6120,942.7418,949.771968276,044.852,169,809.4613,055.4310,307.1121,698.091969332,563.932,548,532.2813,605.609,818.3625,485.33*343 OPINION Petitioner contends that the expenses (including pilot training and depreciation) of operating the two airplanes during the years in issue are deductible by Economics Press as an ordinary and necessary business expense. We disagree. It is our opinion that the primary purpose in purchasing the planes was for the personal use and benefit of petitioner. Only such expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted. Section 1.162-2(a), Income Tax Regs. During the years in issue petitioner was the only person trained and authorized to use the planes. As petitioner testified, the impetus behind the purchases was his need of seclusion for writing and his concurrent need to be accessible to his corporation. During the summers petitioner and his family maintained a residence in the Cape Cod area of Massachusetts. To facilitate travel to and from this residence and the Fairfield office, petitioner used the airplanes which he found more convenient and time saving than commercial or charter*344 flights. Petitioner justified the use of the planes by stating that he was more productive working at the Cape Code residence, but to work in a place so remote from his office required prompt transportation for return when circumstances required his presence in the office. We are of the opinion that this use was more in the nature of a commuting expense, primarily for the personal convenience of petitioner and thus not deductible. See section 262 and the regulations thereunder. See also Fausner v. Commissioner,413 U.S. 838, 839 (1973); Eugene G. Feistman, 63 T.C. , (Nov. 12, 1974). Petitioner also used the planes to travel to the University of Vermont where he served as a university trustee. We find that Economics Press had no business purpose in this travel. Petitioner's decision to serve as a trustee was personal and any benefit to the corporation was only incidental. During the first nine months after the purchase of the first plane the primary use involved training petitioner to be a pilot. In Gibson Products Co.,8 T.C. 654 (1947), we held that a corporate taxpayer could not deduct either the cost of flying lessons taken*345 by its president or the airplane expenses incurred during the training, even though the plane was owned by the corporate taxpayer and was intended to be used partly in its business. Similarly we are of the opinion the expense of the airplanes incurred during the hours spent training petitioner to fly is not a deductible corporate business expense. While we are cognizant of the fact that the planes may indirectly be responsible for increased profits, the primary purpose clearly was as a time saving device for the personal convenience of petitioner. Flying allowed petitioner to spend longer periods of time at his summer residence and more flexibility in his travels. There are many expenses which are helpful to one's business activities but which are not deductible in our tax system. Cf. James A. Carroll,51 T.C. 213, 215 (1968), affd. 418 F. 2d 91 (C.A. 7, 1969). Reviewing the record, however, we do find that petitioner did use the planes for business purposes on behalf of Economics Press on certain occasions. 3*346 Respondent, relying on section 274, 4 argues that Economics Press is not entitled to any deduction for the airplanes. He contends that, since it has not been demonstrated that over 50 percent of the planes' use was for a legitimate corporate business purpose, no deduction is allowable, citing section 1.274-2(e)(4)(ii)(b), 5 Income Tax Regs. To reach this provision of the regulations respondent assumes that the airplanes were entertainment facilities (entertainment being defined in section 1.274-2(b)(1), Income Tax Regs.). *347 Petitioner, on the other hand, contends that section 1.274-2(e)(4)(ii)(b), Income Tax Regs., is inapplicable in this instance. We agree. Section 1.274-2(b)(1)(iii)(c)(1), Income Tax Regs., provides that section 1.274-2, Income Tax Regs., is not applicable with respect to a transportation type facility such as an airplane, even though used on other occasions in connection with entertainment related activities, to the extent the facility is used in pursuit of a trade or business for purposes of transportation not in connection with entertainment. We believe the regulations make it clear that the expenses of nonentertainment use of a transportation type facility (i.e., for business transportation) are not affected by the entertainment facilities rule. In such situations only the regular business expense rules apply (without the application of the entertainment facility deduction test). See also Rev. Rul. 63-144, 1963-2 C.B. 129. 6 We, therefore, find that Economics Press is entitled to partial deductions with respect to the airplanes to the extent of their use for corporate business travel. *348 In addition to disallowing the airplane deductions to the corporation, respondent contends that the fair rental value for the personal use of the airplanes constitutes a constructive dividend to petitioner. We agree. See Challenge Manufacturing Co.,37 T.C. 650, 662-663 (1962). The final issue presented for our determination is whether it was an abuse of discretion for respondent to disallow a portion of Economics Press' additions to its bad debt reserve for the taxable years ending March 31, 1968, and March 31, 1970. Section 166(c) permits deductions from income, in the discretion of the Commissioner, for reasonable additions to a reserve for bad debts. Great latitude is extended to respondent in exercising that discretion; and the burden of establishing an abuse of discretion falls heavily upon the taxpayer. Union National Bank & Trust Co. of Elgin,26 T.C. 537, 543 (1956). See also Harold F. Brooks,63 T.C. 1 (1974). Essentially, a bad debt reserve constitutes an estimate of future losses which can reasonably be expected to*349 result from current business debts. The ultimate question is not whether the proposed addition to the reserve is sufficient to absorb the estimated losses, but rather whether the credit balance in the reserve is adequate for that purpose. Platt Trailer Co.,23 T.C. 1065, 1070 (1955). While the reasonableness of an addition to the reserve will ordinarily be judged according to the taxpayer's experience in collecting its accounts, no hard and fast standard should be adopted. A formula which may have produced a reasonable addition over a series of years might very well prove unreasonable in later years. Black Motor Co.,41 B.T.A. 300, 304 (1940), affd. 125 F. 2d 977 (C.A. 6, 1942). In the final analysis the estimate as to the reserve required for any given year will be measured according to the conditions which exist at the time the estimate is made. Primarily, the reasonableness of any addition will depend upon the total amount of debts outstanding at the close of the year, including current debts as well as those that arose in prior years, and the total amount of the existing reserve. Section 1.166-4(b)(1), Income Tax Regs.*350 Unless petitioner can demonstrate that the allowance claimed is more reasonable than the additions determined by respondent, then the latter amounts will be approved as reasonable additions to the corporation's bad debt reserve. Thus petitioner must show not only that its additions were reasonable but also that respondent's adjustment constituted an abuse of discretion. Westchester Development Company, 63 T.C. , (Nov. 14, 1974). Economics Press has used one percent of sales as its basis for determining its reserve for bad debts for the years in issue and for several years prior thereto. While this method may not necessarily be unreasonable, this of itself does not show an abuse of discretion by respondent. Respondent in making the adjustments applied what is known as the Black Motor Co. formula. This is a percentage formula with the amounts allowable for bad debts computed by taking the ratio of the average of the accounts and notes receivable which are outstanding at the end of the year plus those outstanding during the preceding five years to the average of the debts actually charged off during the same period. Respondent, rather than just using accounts receivable, *351 also used sales in applying the formula if that would allow a greater deduction for a particular year. This formula has been approved as a reasonable method for determining additions to reserves for bad debts. Black Motor Co.,supra.See also, James A. Messer Co.,57 T.C. 848, 865 (1972). Petitioner, in this instance, has not presented any evidence demonstrating that this method was unreasonable as applied to Economics Press during the years in issue. We are of the opinion that while petitioner's method may not necessarily be unreasonable, it has not been established that respondent's adjustment constituted an abuse of discretion. Therefore, the adjustments must be sustained. Petitioner, on the assumption that respondent's method is not found unreasonable, finally argues that a de minimis rule should apply. However, the fact that the amounts involved are not great does not diminish the requisite burden of proof. Decisions will be entered under Rule 155.Footnotes1. Cases of the following petitioners are consolidated herewith: The Economics Press, Inc., docket No. 5422-72; and The Economics Press, Inc., and Nemo Realty Corp., (Subsidiary Company), docket No. 5423-72.↩2. Date of purchase of first plane.↩3. There were approximately 35 hours, or a little less than 20 percent of total flying time, during the taxable year ending March 31, 1968, attributable to corporate business use, and approximately 16-1/2 hours, or a little more than 20 percent of the total flight time, during the taxable year ending March 31, 1970, attributable to corporate business use. The record indicates no corporate business use during the taxable year ending March 31, 1969.↩4. All statutory references are to the Internal Revenue Code of 1954↩, as amended. 5. Pertinent parts of the section 274 regulations are quoted below: § 1.274-2. Disallowance of deductions for certain expenses for entertainment, amusement, or recreation.-- (a) General rules-- * * * * * * * * (2) Entertainment facilities. Except as provided in this section, no deduction otherwise allowable under chapter 1 of the Code shall be allowed for any expenditure with respect to a facility used in connection with entertainment unless the taxpayer establishes-- (i) That the facility was used primarily for the furtherance of the taxpayer's trade or business, and (ii) That the expenditure was directly related to the active conduct of such trade or business. Such deduction shall not exceed the portion of the expenditure directly related to the active conduct of the taxpayer's trade or business. * * * * * (b) Definitions--(1) Entertainment defined--(i) In general. For purposes of this section, the term "entertainment" means any activity which is of a type generally considered to constitute entertainment, amusement, or recreation, such as entertaining at night clubs, cocktail lounges, theaters, country clubs, golf and athletic clubs, sporting events, and on hunting, fishing, vacation and similar trips, including such activity relating solely to the taxpayer or the taxpayer's family. The term "entertainment" may include an activity, the cost of which is claimed as a business expense by the taxpayer, which satisfies the personal, living, or family needs of any individual, such as providing food and beverages, a hotel suite, or an automobile to a business customer or his family. The term "entertainment" does not include activities which, although satisfying personal, living, or family needs of an individual, are clearly not regarded as constituting entertainment, such as (a) supper money provided by an employer to his employee working overtime, (b) a hotel room maintained by an employer for lodging of his employees while in business travel status, or (c) an automobile used in the active conduct of trade or business even though used for routine personal purposes such as commuting to and from work. On the other hand, the providing of a hotel room or an automobile by an employer to his employee who is on vacation would constitute entertainment of the employee. (ii) Objective test. An objective test shall be used to determine whether an activity is of a type generally considered to constitute entertainment. * * * (iii) Special definitional rules--(a) In general. Except as otherwise provided in (b) or (c) of this subdivision, any expenditure which might generally be considered either for a gift or entertainment, or considered either for travel or entertainment, shall be considered an expenditure for entertainment rather than for a gift or travel. * * * * * (c) Expenditures deemed travel. An expenditure described in (a) of this subdivision shall be deemed for travel to which this section does not apply if it is: (1) With respect to a transportation type facility (such as an automobile or an airplane), even though used on other occasions in connection with an activity of a type generally considered to constitute entertainment, to the extent the facility is used in pursuit of a trade or business for purposes of transportation not in connection with entertainment. See also paragraph (e)(3)(iii)(b) of this section for provisions covering non-entertainment expenditures with respect to such facilities. * * * * * (e) Expenditures with respect to entertainment facilities--(1) In general. Any expenditure with respect to a facility used in connection with entertainment shall not be allowed as a deduction except to the extent it meets the requirements of paragraph (a)(2) of this section. (2) Facilities used in connection with entertainment--(i) In general. Any item of personal or real property owned, rented, or used by a taxpayer shall (unless otherwise provided under the rules of subdivision (ii) of this subparagraph) be considered to constitute a facility used in connection with entertainment if it is used during the taxable year for, or in connection with, entertainment (as defined in paragraph (b)(1) of this section). Examples of facilities which might be used for, or in connection with, entertainment include yachts, hunting lodges, fishing camps, swimming pools, tennis courts, bowling alleys, automobiles, airplanes, apartments, hotel suites, and homes in vacation resorts. * * * * * (3) Expenditures with respect to a facility used in connection with entertainment--(i) In general. The phrase "expenditures with respect to a facility used in connection with entertainment" includes depreciation and operating costs, such as rent and utility charges (for example, water or electricity), expenses for the maintenance, preservation or protection of a facility (for example, repairs, painting, insurance charges), and salaries or expenses for subsistence paid to caretakers or watchmen. In addition, the phrase includes losses realized on the sale or other disposition of a facility. (iii) Expenditures not with respect to a facility. The following expenditures shall not be considered to constitute expenditures with respect to a facility used in connection with entertainment-- * * * * * (b) Non-entertainment expenditures. Expenses or items attributable to the use of a facility for other than entertainment purposes such as expenses for an automobile when not used for entertainment; * * * * * * * * (4) Determination of primary use--(i) In general. A facility used in connection with entertainment shall be considered as used primarily for the furtherance of the taxpayer's trade or business only if it is established that the primary use of the facility during the taxable year was for purposes considered ordinary and necessary within the meaning of sections 162 and 212 and the regulations thereunder. * * * a taxpayer shall be deemed to have established that a facility was used primarily for the furtherance of his trade or business if he establishes such primary use in accordance with subdivision (ii) or (iii) of this subparagraph. Subdivisions (ii) and (iii) of this subparagraph shall not preclude a taxpayer from otherwise establishing the primary use of a facility under the general provisions of this subdivision. (ii) Certain transportation facilities. A taxpayer shall be deemed to have established that a facility of a type described in this subdivision was used primarily for the furtherance of his trade or business if-- * * * * * (b) Airplanes. In the case of an airplane, the taxpayer establishes that more than 50 percent of hours flown during the taxable year was in connection with travel considered to be ordinary and necessary within the meaning of section 162 or 212↩ and the regulations thereunder.6. Section 1. Purpose. The purpose of this Revenue Ruling is to answer a series of questions relating to the provisions of the income tax regulations promulgated under section 274 (except for subsection (d) thereof) of the Internal Revenue Code of 1954, added by the Revenue Act of 1962, C.B. 1962-3, 111. * * * * * * * * NONENTERTAINMENT USE 51. Question: Assuming my automobile is used during the year both for entertainment and for business transportation not involving entertainment, can I obtain a deduction for the business transportation use? Answer: Yes. The portion of depreciation and other operating expenses allocable to business transportation continues to be deductible, even if the automobile is considered an entertainment facility used less than 50 percent for business. 52. Question: Does this mean business expenses allocable to operating a facility for other than entertainment purposes are not disallowed under the facility rules? Answer:↩ Yes, that is right. For example, if a taxpayer uses his yacht primarily for personal purposes, but during the year he rents it to unrelated persons at a reasonable rental, the operating costs attributable to the rental income are not disallowed.